UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM LOPEZ,

                Plaintiff,

    v.

SHERIFF LOUIS FALCO, *and* COUNTY
OF ROCKLAND,

                Defendants.

---

No. 23-CV-10420 (KMK)

OPINION & ORDER

Appearances:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Robert B. Weissman, Esq.
Matthew R. Hughes, Esq.
Saretsky Katz & Dranoff, LLP
Elmsford, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

      Plaintiff William Lopez ("Plaintiff") brings this Action against Sheriff Louis Falco

("Falco") and the County of Rockland (the "County," and together with Falco, "Defendants")

pursuant to 42 U.S.C. § 1983, alleging that Defendants retaliated against him in violation of his

rights under the First Amendment when, among other things, they declared him absent-without-

leave from his job and suspended him without pay.  (*See* Compl. ¶¶ 30–31 (Dkt. No. 1).)[1]

Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of

---

[1] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in
the upper-right corner of each page in cites from the record.

Civil Procedure 12(b)(6) (the "Motion").  (*See* Not. of Mot. (Dkt. No. 15).)  For the reasons that

follow, the Court grants Defendants' Motion.

I.  Background

A.  Materials Considered

As a threshold matter, the Court must decide what documents it may consider in deciding

the instant Motion.  Defendants argue that the Court may take into consideration several

documents that Plaintiff referenced or otherwise relied upon in filing his Complaint in this

Action.  (Defs' Mem. of Law in Supp. of Mot. To Dismiss ("Defs' Mem.") 10–11 & n.4 (Dkt.

No. 18); *see also* Decl. of Matthew R. Hughes, Esq. ("Hughes Decl.") (Dkt. No. 16).)  The Court

notes that Plaintiff does not object to its consideration of these materials.  (*See generally* Mem.

of Law in Opp'n to Mot. To Dismiss ("Pl's Opp'n") (Dkt. No. 19).)

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert

the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56."  *Thomas v.*

*Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002); *accord Doe v.*

*County of Rockland*, No. 21-CV-6751, 2023 WL 6199735, at *1 (S.D.N.Y. Sept. 22, 2023).

"Nevertheless, the Court's consideration of documents attached to, or incorporated by reference

in the Complaint, and matters of which judicial notice may be taken, would not convert the

motion to dismiss into one for summary judgment."  *Thomas*, 232 F. Supp. 2d at 275; *see also*

*Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6)

motions to dismiss," courts may "consider the complaint in its entirety . . . , documents

incorporated into the complaint by reference, and matters of which a court may take judicial

notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In

deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings,

2

documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration adopted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

Defendants have submitted the following documents in support of their Motion: (1) a Rockland County Correction Officers Benevolent Association Grievance Form dated October 29, 2019, (*see* Hughes Decl. Ex. B ("Oct. 29, 2019 Grievance") (Dkt. No. 16-2)); (2) a Rockland County Correction Officers Benevolent Association Grievance Form dated March 2, 2020, (*see id.* Ex. C ("Mar. 2, 2020 Grievance") (Dkt. No. 16-3)); (3) a Rockland County Correction Officers Benevolent Association Grievance Form dated October 5, 2020, (*see id.* Ex. D ("Oct. 5, 2020 Grievance") (Dkt. No. 16-4)); and (4) an Arbitration Opinion and Award dated July 27, 2020, (*see id.* Ex. E ("July 27, 2020 Arbitration Op.") (Dkt. No. 16-5)).[2]

Consistent with the decisions of other courts in this District, the Court concludes that it may consider the three Grievance Forms, the authenticity of which is undisputed.  *See, e.g.*, *Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *10 (S.D.N.Y. Sept. 30, 2015) ("[S]everal courts have considered grievances relevant to a plaintiff's claims where, as here, the plaintiff incorporated the grievances by reference into the complaint."); *see also Ellison v. Evans*, No. 13-CV-885, 2013 WL 5863545, at *1 n.5 (S.D.N.Y. Oct. 31, 2013) (considering grievances that the defendants submitted "[b]ecause the [] documents [were] either explicitly referred to or incorporated by reference in [the] plaintiffs' complaint"), *aff'd sub nom.*, *Fuller v. Evans*, 586 F. App'x 825 (2d Cir. 2014) (summary order), *cert. denied*, 135 S. Ct. 2807 (2015); *Sanchez v.*

---

[2] In addition to these four documents, Defendants have also submitted a declaration from Captain John Liska.  (Decl. of Captain John Liska ("Liska Decl.") (Dkt. No. 17).)  Given that Defendants have provided no basis for the Court to consider this declaration, the Court declines to consider it at this stage of the litigation.

*Velez*, No. 08-CV-1519, 2009 WL 2252319, at *1 n.1 (S.D.N.Y. July 24, 2009) (explaining that "[b]ecause [the] plaintiff's grievances [were] referenced in the complaint, the grievance documents [were] incorporated by reference and properly considered on a motion to dismiss").

Turning to the Arbitration Opinion and Award, a court may—pursuant to the Federal Rules of Evidence—take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under to this Rule, "courts have regularly taken judicial notice of arbitration awards . . . in considering a motion to dismiss . . . ." *Cox v. Perfect Bldg. Maint. Corp.*, No. 16-CV-7474, 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017) (collecting cases); *see also Dr.'s Assocs., Inc. v. Patel*, No. 18-CV-2386, 2019 WL 3916421, at *2 n.5 (S.D.N.Y. July 19, 2019) (same). Because Plaintiff does not dispute the authenticity of the Arbitration Opinion and Award, the Court is permitted to take judicial notice of the award at this early juncture. *See Purjes v. Plausteiner*, No. 15-CV-2515, 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016) (collecting cases in which courts have taken judicial notice of arbitration awards); *see also Caldarera v. Int'l Longshoremen's Ass'n, Local 1*, 765 F. App'x 483, 485 n.2 (2d Cir. 2019) (summary order) (finding no error in a district court's decision to take judicial notice of an arbitration award). "However, '[w]hile the Court is permitted to take judicial notice of the existence of [an] [a]rbitration [d]ecision on a motion to dismiss, it cannot do so to establish the truth of the facts asserted therein." *Brown v. N.Y.C. Transit Auth.*, No. 22-CV-2949, 2024 WL 1347283, at *5 (S.D.N.Y. Mar. 29, 2024) (quoting *Beaton v. Metro. Transp. Auth. N.Y.C. Transit*, No. 15-CV-8056, 2016 WL 3387301, at *4 (S.D.N.Y. June 15, 2016)).

B.  Factual Background

Unless otherwise stated, the following facts are drawn from the Complaint and the above-referenced Exhibits that Defendants submitted in connection with their Motion. The facts

alleged in the Complaint are assumed true for the purpose of resolving the instant Motions. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

### 1. The Parties

Plaintiff is a former corrections officer, who had been employed by the County. (Compl. ¶ 1.) During all times relevant to this Action, Falco was the County's duly-elected Sheriff. (*Id.* ¶ 2.)

### 2. Plaintiff's Union Activity

From 2016 to 2017, and again from 2019 to 2020, Plaintiff served as an officer for the "Correction Officers' Association/Union" (the "Union"). (*Id.* ¶ 5.) As alleged, Plaintiff is "widely regarded as one of the [Union's] chief strategists and spokes[people;] [he is] highly knowledgeable about the collective bargaining agreement [('CBA'),] and a source of guidance and advice to officers aggrieved by [] Falco and his immediate subordinates." (*Id.* ¶ 6.) Falco was "fully aware of [Plaintiff's] union activism, including his support in 2015 of Richard Vasquez" who had run against Falco. (*Id.* ¶ 7.)

While he served as a Union officer from 2019 to 2020, Plaintiff worked closely with the Union's president, David Bates ("Bates"). (*Id.* ¶ 8.) In particular, Plaintiff and Bates initiated grievances and demands for arbitration that allegedly "infuriated [Falco,] but were squarely within their duties and responsibilities as" officers in the Union. (*Id.*)

The record at this early stage reflects that Plaintiff filed three grievances from 2019 to 2020. (*See* Oct. 29, 2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance.) Turning to the first grievance, shortly after October 29, 2019, Plaintiff submitted a Grievance Form, stating that "[n]o where in [the] current agreement between the County . . . and the [Union] does it say an officer who calls in/has a pre-approved sick day (doctor appointment) can't work a

switch on the following shift on that day." (Oct. 29, 2019 Grievance 2.) As a remedy, Plaintiff

sought the return of "6 ½ hours of vacation time" and the removal of "[a] letter [reprimanding

him] from his file." (*Id.*) Ultimately, this grievance was brought before an arbitrator. (*See*

*generally* July 27, 2020 Arbitration Opinion.) In her decision, the arbitrator ruled in Plaintiff's

favor, holding that Falco violated the CBA when he denied Plaintiff the opportunity to switch

shifts and cover a shift on same day he had used sick leave, and ordering that Plaintiff's vacation

time be returned and the letter reprimanding him be removed from his file. (*See id.* at 19; *see*

*also* Compl. ¶¶ 9–10.)

Next, on or around March 2, 2020, Plaintiff submitted another Grievance Form, alleging

that he "ha[d] unlimited sick time due to his 911 illness, that has been certified by the [S]tate and

[C]ounty. [Plaintiff] shouldn't be penalized on his evaluation for using sick time that is related

to his 911 illness. [Plaintiff] has provided medical documentation for all of his sick time use."

(Mar. 2, 2020 Grievance 2.) As a remedy, Plaintiff asked "[n]ot to be penalized for having

legitimate sick time use . . . and for his legitimate sickness not to result in the loss of employment

benefits or to impair his employment rights under the law or CBA." (*Id.*) This grievance was

sustained by both reviewing supervisors. (*Id.* at 3.)

Finally, on October 5, 2020, Plaintiff submitted another Grievance Form, asserting that

the County improperly required him to submit medical documentation for his use of ten hours of

family sick leave between September 24 and 25, 2019, and that his 2019 employment evaluation

noted his failure to provide that documentation. (*See* Oct. 5, 2020 Grievance 2.) In terms of the

requested remedy, Plaintiff requested that Falco "[c]ease & [d]esist from requesting a doctor's

note for family sick [leave] and to [c]ease from writing it on our evaluations." (*Id.*) Both of the

reviewing supervisors rejected this grievance. (*Id.* at 3.)

Plaintiff alleges that, as a result of Plaintiff's activities and actions relating to the Union, Falco "bore a grudge" against him, as well as other leaders of the Union.  (Compl. ¶ 11.)

### 3.  Alleged Retaliation Against Plaintiff

While working as a corrections officer in early 2021, Plaintiff was assaulted and thereafter qualified for benefits under N.Y. Gen. Mun. Law § 207-c.  (*Id.* ¶¶ 12–13.)[3]  Indeed, throughout 2021 Plaintiff was plagued with work-related injuries, and his treating physician did not clear him to return to work.  (*Id.* ¶ 14.)  However, based upon an independent medical examination conducted by a physician that Falco selected, Falco—at some unspecified time— ordered Plaintiff to return to work, indicating that he intended to remove Plaintiff from "[§] 207- c status."  (*Id.* ¶¶ 15, 17.)  According to Plaintiff, Falco did this because he wanted to "punish[] Plaintiff."  (*Id.* ¶ 15.)  At around that same time, Falco did revoke Plaintiff's § 207-c status.  (*Id.* ¶ 16.)

Plaintiff then sought arbitration based upon the revocation of his § 207-c status.  (*Id.* ¶ 16.)  After a three-day hearing in the summer of 2022, the hearing officer concluded that Falco "had a rational basis to require [P]laintiff to return to work" in December 2021.  (*Id.* ¶ 17.)  Rather than appeal that decision, Plaintiff returned to work "within days of [the] issuance" of the hearing officer's decision.  (*Id.* ¶ 18.)  But, instead of accepting Plaintiff back to work, Falco directed that Plaintiff be placed on absent-without-leave ("AWOL") status, suspended his salary, and refused to allow further contributions toward his health insurance.  (*See id.* ¶ 19.)[4]  Although

---

[3] As relevant here, § 207-c provides for the payment of salary and/or wages, as well as medical and/or hospital expenses, for corrections officers who are injured in connection with the performance of their duties.  *See generally* N.Y. Gen. Mun. Law § 207-c.

[4] Plaintiff avers that, during the 2022 arbitration proceeding, Falco had represented that Plaintiff would be allowed to come back to work.  (*See* Compl. ¶ 19.)

Plaintiff objected to this treatment, nothing was done until around seven weeks later, in early

2023, when he "presented a note from a nurse practitioner who attested to his [lack of]

psychiatric []fitness." (*Id.* ¶ 20.)

Following the receipt of the nurse practitioner's note, Defendants placed Plaintiff back on

payroll and allowed him to use his vacation and sick time accruals. (*See id.* ¶ 21.) But, in May

2023, "more than [two] years after [Plaintiff suffered] injuries from the assault [that] caused

[him] to remain out of work," Defendants terminated Plaintiff's employment pursuant to N.Y.

Civ. Serv. Law § 71. (*Id.*)[5] Plaintiff alleges that Defendants "never put another officer who was

eligible for worker compensation benefits . . . on AWOL status, disallowing their use of earned

accruals." (*Id.* ¶ 22.)[6] Further, Plaintiff asserts that Defendants "have never treated another

[c]orrections [o]fficer like this, that is, [not] []allowing him or her to return to work after

suspending their [§] 207[-c] status and declaring them AWOL, as opposed to allowing them to

receive worker compensation [benefits] if [they were] unable to return to work while exhausting

their accruals." (*Id.* ¶ 24.)

---

Additionally, Plaintiff asserts that Falco's and—by extension—the County's decision here was carried out "without any due process." (*Id.* ¶ 23.) The Court notes that Plaintiff did not bring any sort of due process claim. (*See generally id.*)

[5] To the extent it is relevant here, § 71 allows public employers to terminate the employment of civil servants with an occupational disability if they have been unable to perform their full duties for one year. *See generally* N.Y. Civ. Serv. Law § 71. Although it is not entirely clear from the Complaint, Defendants' undisputed (and unobjected-to) reliance on § 71 demonstrates that Plaintiff did not return to work from the date he was assaulted in early 2021 until shortly after the unfavorable arbitration decision. (*See* Compl. ¶¶ 12–18.)

[6] An apparent typographical error makes this paragraph of the Complaint difficult to decipher. (*See* Compl. ¶ 22 ("Defendants never put another officer who was eligible for worker compensation benefits if not 207-c] [sic] on AWOL status[] . . . .").)

After Plaintiff was terminated, "and in further retaliation for his union activities," Falco denied Plaintiff a retirement badge, even though Plaintiff had been terminated in good standing pursuant to § 71 because he could not return to work in light of the work-related injuries he had sustained in 2021. (*Id.* ¶ 25; *see also id.* ¶ 26 ("Falco never treated an officer who supported him and was separated from the department due to medical injuries in this manner[,] and no departmental policy or practice prevented him from issuing a retirement badge to [P]laintiff.").)

As a result of the treatment described above—which, as alleged, "stemmed from anti-union animus"—Plaintiff asserts that he suffered emotional distress and "tangible detriment." (*Id.* ¶¶ 27–28.) Plaintiff further states that Falco mistreated "at least seven other union leaders who opposed his policies" based upon that same animus. (*Id.* ¶ 28.)

C. Procedural History

Plaintiff filed the Complaint on November 29, 2023. (*See* Compl.) In the Complaint, Plaintiff appears to assert two causes of action. (*See id.* ¶¶ 30–31.) Specifically, he alleges that Defendants "retaliated against him for the exercise of his First Amendment associational and speech rights" when they: (1) "declar[ed] [P]laintiff AWOL when [he] had more than 1000 hours of accruals and suspend[ed] [his] pay and health insurance"; and (2) "den[ied] [P]laintiff a retirement badge though [he] was terminated for his incapacity to return to work following a workplace assault and while he was otherwise in good standing[.]" (*Id.*)[7]

On December 26, 2023, Defendants filed a pre-motion letter, requesting leave to file the instant Motion. (*See* Letter from Robert B. Weissman, Esq. to Court (Dec. 26, 2023) (Dkt. No. 9).) Plaintiff filed a response on January 6, 2024. (*See* Letter from Michael H. Sussman,

---

[7] In terms of relief, Plaintiff seeks: (1) compensatory damages against both Defendants; (2) punitive damages against Falco in his individual capacity; (3) an order requiring Falco to provide Plaintiff with a retirement badge; and (4) attorneys' fees and costs. (Compl. 5–6.)

Esq. to Court (Jan. 6, 2024) (Dkt. No. 12).)  Following a pre-motion conference on January 25, 2024, the Court adopted a briefing schedule for the instant Motion.  (*See* Dkt. (minute entry for Jan. 25, 2024); Scheduling Order (Dkt. No. 14).)

Pursuant to that briefing schedule, Defendants filed their Motion on February 23, 2024. (*See* Not. of Mot.; Hughes Decl.; Liska Decl.; Defs' Mem.)  On March 15, 2024, Plaintiff filed his Opposition.  (*See* Pl's Opp'n.)  Defendants filed their Reply on March 29, 2024.  (*See* Defs' Reply Mem. of Law in Supp. of Mot. To Dismiss ("Defs' Reply") (Dkt. No. 20); Reply Decl. of Matthew R. Hughes, Esq. (Dkt. No. 21).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id*. (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[]

10

complaint must be dismissed," *id*.; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id*. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

     1. Plaintiff's Claims

At the outset, the Court notes that Plaintiff's threadbare, six-page Complaint is far from a model of clarity.[8]  Therefore, it is forced to frame his claims more precisely for him so that it can decide the instant Motion.  As noted above, the Complaint purports to raise the following two causes of action:

1) "By declaring [P]laintiff AWOL when [he] had more than 1[,]000 hours of accruals and suspending any pay and health insurance, [D]efendants Falco and the County retaliated against him for the exercise of his First Amendment associational and speech rights . . . ."  (Compl. ¶ 30.)

2) "By denying [P]laintiff a retirement badge though [he] was terminated for his incapacity to return to work following a workplace assault and while he was otherwise in good standing, [D]efendants Falco and the County retaliated against him for the exercise of his First Amendment associational and speech rights . . . ."  (*Id.* ¶ 31.)

The Court construes the Complaint as raising hybrid speech/associational claim, which courts consistently analyze in tandem.  *See Lynch v. Ackley*, 811 F.3d 569, 583 (2d Cir. 2016) ("[Plaintiff's] claim based on his First Amendment association rights is subject to the same analysis . . . for [his] First Amendment free-speech right based on the same incident."); *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185 (2d Cir. 2003) (holding that "hybrid" associational/speech claims are subject to the same analysis that applies to First Amendment speech claims); *accord Agosto v. N.Y.C. Dep't of Educ.*, No. 17-CV-9066, 2019 WL 13255510,

---

    [8] Making matters worse, the Complaint also contains a disproportionate number of typographical and grammatical errors.  (*See* Compl. ¶¶ 6, 8, 17, 19, 22.)
    Further, the Court notes that Plaintiff's submissions—which are not text searchable—do not comply with the Court's individual rules, which clearly state that Parties should be sure "that PDFs uploaded to ECF, such as memoranda, declarations, or exhibits, are text searchable" to the extent possible.  Individual Rules of Practice of the Honorable Kenneth M. Karas § II.G. Counsel is therefore directed to re-review the Court's individual rules.  (*See* Dkt. (entry dated Nov. 30, 2023) (stating that counsel should "download and review the Individual Practices of" this Court).)

at *4–6 (S.D.N.Y. Aug. 12, 2019) (analyzing the plaintiff's separate "free-speech and association claims" together), *aff'd*, 982 F.3d 86 (2d Cir. 2020).

In his Opposition to Defendants' Motion, Plaintiff asserts that he separately raises a standalone First Amendment retaliation claim on the basis that Defendants "retaliated against him because of his union association and activism." (Pl's Opp'n 11.) However, to put it charitably, Plaintiff's assertion amounts to nothing more than a post-hoc attempt to amend the Complaint through his Opposition, which he simply cannot do. *See Cortese v. Skanska Koch, Inc.*, No. 20-CV-1632, 2021 WL 429971, at *18 n.4 (S.D.N.Y. Feb. 8, 2021) ("[The] [p]laintiffs' argument fails for the simple reason that it was not pleaded and a party cannot amend its complaint through a brief."); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (finding that a plaintiff may not amend its complaint through its opposition brief); *Schulz v. Medtronic, Inc.*, No. 21-CV-414, 2022 WL 503960, at *2 (D. Conn. Feb. 18, 2022) ("[I]t is axiomatic that [a] [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss.") (quoting *Weir v. City of New York*, No. 05-CV-9268, 2008 WL 3363129, at *9 (S.D.N.Y. Aug. 11, 2008)); *Red Fort Cap., Inc. v. Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 476 (S.D.N.Y. 2019) (same).[9]

Moreover, the Court is thoroughly unpersuaded by Plaintiff's heavy reliance on *State Employees Bargaining Agent Coalition v. Rowland*, 718 F.3d 126 (2d Cir. 2013) to support this assertion. (*See* Pl's Opp'n 12–13, 15.) In *Rowland*, the plaintiffs alleged that the defendants "violated their First Amendment right to freedom of association by discriminatorily laying off

---

[9] The Court recognizes that it must draw all reasonable inferences in Plaintiff's favor at this juncture, *see Daniel*, F. Supp. 2d at 304 n.1, but Plaintiff is represented by counsel and therefore is *not* entitled to having the Court interpret his Complaint to raise the strongest argument it obliquely suggests, as it would for a pro se plaintiff, *see Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013).

only union members when reducing the state's work force." 718 F.3d at 129. Indeed, the defendants conceded that they "intentionally fired only union members"—approximately 2,800 of them—in order to reduce the cost of Connecticut's workforce. *Id.* at 130, 134–35. It was under those specific circumstances, which bear no resemblance to those alleged in the Complaint, that the Second Circuit analogized to cases holding that "hiring based on political party affiliation was subject to strict scrutiny" and concluded that the defendants were required to demonstrate that "the terminations were narrowly tailored to further vital government interests." *Id.* at 133–35 (quotation marks omitted). Further, the Second Circuit noted that the strict scrutiny analysis that Plaintiff prefers here was appropriate there because the plaintiffs had not "identified any expression of views by the laid-off workers, but instead allege[d] that [the] defendants retaliated against them because they refused [the] defendants' proposed concessions." *Id.* at 136 n.13 (stating that "the issue in this case is whether [the plaintiffs] could be retaliated against based on their union affiliation (or non-affiliation), not whether [they] could be retaliated against based on any protected speech" (quotation marks omitted)). In doing so, the Second Circuit explained that, for the line of cases concerning retaliation for expressing views on matters of public concern—which is set forth below—to apply, "there must be an expression of views." *Id.* (quoting *Morin v. Tormey*, 626 F.3d 40, 43 (2d Cir. 2010)). And in the instant case, Plaintiff plainly claims that the Defendants' alleged retaliation stemmed from his "expression of views." (*See* Compl. ¶¶ 5–11 (alleging, inter alia, that Plaintiff: was among the Union's "chief strategists and spokes[people]" and a "union activis[t]"; supported an alternative candidate for Sheriff; and initiated "grievances and demands for arbitration" that "infuriated" Falco); *see also* Oct. 29, 2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance.)

14

Accordingly, notwithstanding Plaintiff's attempt at re-framing his claims, the Court will proceed to analyze the viability of Plaintiff's hybrid speech/associational First Amendment retaliation claims as alleged in the Complaint.

### 2. Applicable Legal Standard

Having outlined the contours of Plaintiff's claims, the Court now sets forth the legal standard applicable to those claims. "[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context[.]'" *Lefebvre v. Morgan*, No. 14-CV-5322, 2016 WL 1274584, at *7 (S.D.N.Y. Mar. 31, 2016) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). "For a public employee to state a First Amendment retaliation claim, the employee must allege that (1) he or she 'spoke as a citizen on a matter of public concern,' (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected speech and adverse employment action." *Foy v. N.Y. State Unified Ct. Sys.*, — F. Supp. 3d —, 2024 WL 3270711, at *8 (E.D.N.Y. July 2, 2024) (ultimately quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *accord Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018); *Novick v. Village of Wappingers Falls*, 376 F. Supp. 3d 318, 331 (S.D.N.Y. 2019).

"[T]he [preliminary] First Amendment inquiry must proceed in two parts. 'The first component requires determining whether the employee spoke as a citizen on a matter of public concern.'" *Montero*, 890 F.3d at 395 (alteration omitted) (quoting *Garcetti*, 547 U.S. at 418; *see also Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) ("A court conducts a two-step inquiry to determine whether a public employee's speech is protected: 'The first requires determining whether the employee spoke as a citizen on a matter of public concern.'" (quoting *Garcetti*, 547 U.S. at 418)). This first step itself involves "two inquiries": "(1) whether

the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 420–22). Importantly, "a public employee bringing a First Amendment freedom of association claim must [likewise] persuade a court that the associational conduct at issue touches on a matter of public concern." *Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416, 2019 WL 3202747, at *17 (S.D.N.Y. July 16, 2019) (alteration adopted) (quoting *Cobb v. Pozzi*, 363 F.3d 89, 102–03 (2d Cir. 2004)); *see also Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 246 (S.D.N.Y. 2009) (holding that "in order to state a viable First Amendment free association claim, Plaintiff must allege that the associational activity at issue touches upon a matter of public concern").

"If the answer is no [to either question in the first step of this analysis], the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Montero*, 890 F.3d at 395 (quoting *Garcetti*, 547 U.S. at 418).

> If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis[, so named in light of *Pickering v. Board of Education*, 391 U.S. 563 (1968)]: whether the relevant government entity "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer."

*Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 573 U.S. 228, 237 (2014)); *see also Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) ("[W]e ask first whether the employee's expressive conduct was speech as a citizen on a matter of public concern. If the answer is yes, then the possibility of a First Amendment claim arises. If the answer is no, the employee has no

First Amendment cause of action based on his or her employer's reaction to the speech." (quotation marks omitted) (citing *Garcetti*, 547 U.S. at 418)).[10]

The *Pickering* analysis requires the Court to "seek a balance between the interests of the employee, as a citizen, in commenting upon matter of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers*, 461 U.S. 138, 142 (1983) (citation, alteration, and quotation marks omitted). "In the *Pickering* balancing analysis, 'the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression.'" *Jackler*, 658 F.3d at 237 (quoting *Connick*, 461 U.S. at 150). "Justifications may include such considerations as maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute." *Piscottano*, 511 F.3d at 271. "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Jackler*, 658 F.3d at 237 (quoting *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999)). "The weighing of the competing interests is a matter of law for the court." *Id.*; *see also Jean-Gilles v. County of Rockland*, 463 F. Supp. 2d 437, 450 (S.D.N.Y. 2006) ("[T]his balancing of interests . . . poses a question of law for the court.").

---

[10] As the Second Circuit recently explained, *Pickering* and *Garcetti* set forth distinct analytical frameworks that are, nonetheless, related. *See Heim v. Daniel*, 81 F.4th 212, 224 (2d Cir. 2023). Specifically, "[t]he *Garcetti* Court narrowed the scope of First Amendment protection for public employees, inserting an additional rung into th[e] longstanding *Pickering* framework." *Id.* (quotation marks omitted). Because *Garcetti* requires public-employee plaintiffs to speak as "citizens" rather than "public employees" in order for "the Constitution [to] insulate their communications from employer discipline[,] . . . under *Garcetti*, 'employee speech'—i.e., speech pursuant to a public employee's official duties—is weeded out before even reaching the *Pickering* framework." *Id.* (quoting *Garcetti*, 547 U.S. at 421).

"Evidence that such harms or disruptions have in fact occurred is not necessary.  The employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano*, 511 F.3d at 271.  "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52.  However, in order for Defendants to meet their burden justifying Plaintiff's discharge, there must be a "demonstrated nexus between the employee's speech and the employer's operations." *Piscottano*, 511 F.3d at 271.  "Where there is no such nexus, the state's interest as an employer is not implicated, and restrictions on the employee's speech will be subjected to the same scrutiny given to restrictions imposed on citizens' speech by the state as sovereign." *Id.* (citing *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 465–66 (1995)).

With respect to the second element of the analysis First Amendment retaliation analysis, Plaintiff must demonstrate that Defendants took an adverse employment action against him that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)); *accord Persaud v. City of New York*, No. 22-CV-2919, 2024 WL 2159852, at *4 (S.D.N.Y. May 14, 2024) (citing *Specht v. City of New York*, 15 F.4th 594, 604 (2d Cir. 2021)).  Finally, "[t]o demonstrate a causal connection a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quotation marks omitted); *see also Heim*, 81 F.4th at 222 (same).

3.  Application

In support of their Motion, Defendants argue that Plaintiff failed to plead facts showing that he was retaliated against for engaging in any speech or association protected by the First Amendment.  (*See* Defs' Mem. 15–27.)  Specifically, Defendants contend that the grievances filed by Plaintiff did not raise matters of public concern, (*see id.* at 16–20), and that—in connection with his grievances—Plaintiff was speaking as a public employee rather than a private citizen, (*see id.* at 21–27).  In addition, Defendants assert that the decision to deny Plaintiff a retirement badge is not a cognizable adverse action.  (*See id.* at 31–32.)  Finally, Defendants argue that Plaintiff has not plausibly pled a causal relationship between his union activities and Defendants alleged adverse actions.  (*See id.* at 27–31.)[11]

The Court will address each of Defendants' arguments to the extent necessary to resolve the instant Motions.

a.  Matter of Public Concern

The Court begins by considering whether Plaintiff's speech and associational activities, as alleged, implicate matters of public concern.  "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to

---

[11] Defendants make no specific argument against Plaintiff's apparent contention that the County is directly liable for the alleged misconduct at issue here because Falco is a "final policymaker."  (Compl. ¶ 3.)  *See Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (explaining that "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question" can constitute an "official policy or custom" for purposes of establishing municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978)); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (internal quotation marks and citation omitted)).  The Court assumes that this was a strategic decision on the part of Defendants' counsel.

the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (citation and quotation marks omitted); *see also Jackler*, 658 F.3d at 236 ("[A] topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004))). "Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600; *accord Connick*, 461 U.S. at 147–48; *Montero*, 890 F.3d at 399. "[S]peech that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection." *Montero*, 890 F.3d at 399–400 (alterations adopted) (citations and quotation marks omitted). In this analysis, the "forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern" because a "petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011); *accord Agosto*, 982 F.3d at 95.

To the extent Plaintiff relies upon his "grievances and demands for arbitration" in connection with his First Amendment retaliation claims, (Compl. ¶¶ 8–10), Defendants argue that such speech does not implicate matters of public concern, (*see* Defs' Mem. 16–20). The Court agrees.

In the Complaint, Plaintiff asserts that, while serving as an officer in the Union from 2019 to 2020, he filed "grievances and demands for arbitration [that] infuriated" Falco. (Compl.

¶ 8.)  Although he gives few details, Plaintiff does allege that one of his grievances, and the follow-on arbitration, concerned Falco's denial of Plaintiff's request for "the chance to switch shifts and cover a shift on the same day he had used sick leave for an earlier shift so as to keep a medical appointment."  (*Id.* ¶ 9.)  The grievance documents that Defendants submitted along with their Motion shed more light on the subject matter of Plaintiff's grievances.[12]  More specifically, in accord with the allegations in the Complaint, Plaintiff's October 29, 2019 Grievance stated that "[n]o where in [the] current agreement between the County . . . and the [Union] does it say an officer who calls in/has a pre-approved sick day (doctor appointment) can't work a switch on the following shift on that day[,]" and, as a remedy, Plaintiff sought the return of "6 ½ hours of vacation time" and the removal of "[a] letter [reprimanding him] from his file."  (Oct. 29, 2019 Grievance 2.)  Plaintiff's March 2, 2020 Grievance alleged that he was "penalized on his evaluation for using sick time that [was] related to his 911 illness" for which he had "unlimited sick time" that had been "certified by the [S]tate and [C]ounty."  (Mar. 2, 2020 Grievance 2.)  As a remedy, Plaintiff asked "[n]ot to be penalized for having legitimate sick time use . . . and for his legitimate sickness not to result in the loss of employment benefits or to impair his employment rights under the law or CBA."  (*Id.*)  Finally, Plaintiff asserted in his October 5, 2020 Grievance that the County improperly required him to submit medical documentation for his use of ten hours of family sick leave between September 24 and 25, 2019, and that his 2019 employment evaluation noted his failure to provide that documentation.  (*See* Oct. 5, 2020 Grievance 2.)  As to the requested remedy, Plaintiff requested that Falco "[c]ease &

---

[12] It bears noting that Plaintiff does not appear to argue that he filed additional grievances or demands for arbitration while serving as a Union officer from 2019 to 2020 beyond those that Defendants submitted, on behalf of himself or anyone else in the Union.  (*See generally* Pl's Opp'n.)

[d]esist from requesting a doctor's note for family sick [leave] and to [c]ease from writing it on our evaluations." (*Id.*)

The Court concludes that Plaintiff's grievances—and his one related demand for arbitration—do not "pertain to a matter of public concern" because they reflect "speech on a purely private matter[—namely] an employee's dissatisfaction" with personal sick and vacation time matters. *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) (quoting *Lewis*, 165 F.3d at 164). Individually and collectively, Plaintiff's grievances touch on "issue[s] that [are] personal in nature[, are] generally related to [his] own situation" and are plainly "calculated to redress personal grievances." *Montero*, 890 F.3d at 399–400 (alteration adopted) (citations and quotation marks omitted). The October 29, 2019 Grievance concerned *Plaintiff's own* sick time, vacation time, and personnel file. (*See* Oct. 29, 2019 Grievance 2.) Likewise, the March 2, 2020 Grievance related to *Plaintiff's* sick time. (*See* Mar. 2, 2020 Grievance 2.) And lastly, the October 5, 2020 Grievance addressed—yet again—*Plaintiff's* sick time. (*See* Oct. 5, 2020 Grievance 2.) Neither the Complaint nor the Grievance Forms reflect that Plaintiff "raised [any] other concrete instances of [similar issues, beyond his own] *personal experiences*." *Belyea v. City of Glen Cove*, No. 20-CV-5675, 2022 WL 3586559, at *23 (E.D.N.Y. Aug. 22, 2022) (emphasis added); *see also Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 84 (2d Cir. 2022) (stating that the Second Circuit has "suggested that internal workplace complaints— especially those filed with an employer using an internal grievance procedure rather than through a channel available to the public—are rarely made to communicate to the public or to advance a political or social point of view beyond the employment context" (quotation marks omitted)); *Peterson v. N.Y.C. Dep't of Educ.*, No. 18-CV-1515, 2020 WL 2559835, at *8 (E.D.N.Y. May 20, 2020) ("[W]hile the First Amendment invests public employees with certain rights, it does

22

not empower them to constitutionalize [their] employee grievance[s]." (alterations in original) (quoting *Garcetti*, 547 U.S. at 420)); *Bell v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 17-CV-937, 2019 WL 1305809, at *10 (N.D.N.Y. Mar. 22, 2019) ("[A]n employee's complaints about scheduling and overtime pay are not matters of public concern; such claims are the quintessential employee grievance not protected by the First Amendment."); *Adams v. N.Y. State Educ. Dep't*, 705 F. Supp. 2d 298, 302–03 (S.D.N.Y. 2010) (holding that the plaintiffs' speech did not raise any matters of public concern where it "concerned personal grievances" relating to their "work schedules," among other things); *cf. Novick*, 376 F. Supp. 3d at 332, 334–35 (concluding that "raising issues about scheduling," "setting forth demands for CBA negotiations," and "advocating against a particular hiring practice" involved matters of public concern where those issues were raised "*on behalf of [the union] and its members*" (emphasis added)).  The fact that Plaintiff raised his grievances through "an internal grievance procedure[,]" (*see* Oct. 29, 2019 Grievance (internal Union form); Mar. 2, 2020 Grievance (same); Oct. 5, 2020 Grievance (same)), further demonstrates that they did no implicate matters of public concern.  *See Guarnieri*, 564 U.S. at 398 ("[A] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context.").

For these same reasons, Plaintiff's alleged associational conduct also fails to implicate any cognizable matters of public concern.  *See Ahmad*, 2019 WL 3202747, at *17 (explaining that associational claims must also "touch[] on [] matter[s] of public concern" (citation omitted)). Plaintiff alleges that: he was a Union officer from 2016 to 2017 and 2019 to 2020, (*see* Compl. ¶ 5); he was "widely regarded as one of the [Union's] chief strategists and spokesman[,] and [was] highly knowledgeable about the [CBA,] and a source of guidance and advice to officers

aggrieved by [management,]" (*id.* ¶ 6); and he "worked closely with" the Union's president during his 2019–20 tenure as a Union officer when he filed the grievances and arbitration demand discussed above, (*id.* ¶ 8).  Although there is no question that the First Amendment right to free association includes "the right of employees to associate in unions," *Rowland*, 718 F.3d at 132, these general associational allegations do not permit the Court to plausibly infer that Defendants retaliated against him *because* he was in a Union or *because* of some specific Union activism (apart from his purely personal grievances).  *See Lynch*, 811 F.3d at 582 (noting that "not . . . all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union").[13]

Plaintiff's various arguments contending that he plausibly raised matters of public concern through his union activity are unavailing.  To start, Plaintiff argues that "the lawful enforcement of [CBAs] is inherently a matter of public concern and importance, not calculated to redress 'personal grievances[.]'"  (Pl's Opp'n 17–18; *see also id.* at 17 (stating, without citation, that, "[i]n the public sector, [vindicating the terms of a CBA] is inherently of public, not private, concern").)  However, as noted in the preceding paragraph, the Second Circuit has already explained that "not . . . all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union."  *Lynch*, 811 F.3d at 582; *accord Agosto*, 982 F.3d at 95; *see also Shara*, 46 F.4th at 85 (same); *Montero*, 890 F.3d at 399 ("[The] broad dicta [in *Clue v. Johnson*, 179 F.3d 57 (2d Cir. 1999)] that union activities

---

[13] Insofar as Plaintiff relies on the general assertion in the Complaint that Falco's "course of treatment" of Plaintiff "stemmed from anti-union animus" in connection with the associational aspect of his claims, (Compl. ¶ 28), it bears noting that Plaintiff "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary[,]" *Cobb*, 363 F.3d at 108 (internal citations and quotation marks omitted).

criticizing management constitute matters of public concern has been walked back by our subsequent case law[, including *Lynch*.]"); *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) (stating that "retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by the mere fact that one or two of a public employee's comments could be construed broadly to implicate matters of public concern." (alteration adopted) (quotation marks omitted)).

In addition, Plaintiff's reliance on *Montero* is misplaced.  (*See, e.g.*, Pl's Opp'n 18.) There, the plaintiff alleged that he was retaliated against because he: (1) criticized a police union president's relationship with a police commissioner; (2) criticized the commissioner's decisions to discontinue several police units; and (3) called for a no-confidence vote regarding that commissioner.  *See Montero*, 890 F.3d at 391.  As relevant here, the Second Circuit affirmed the district court's conclusion that the criticisms of a union president "reflected a *personal* rivalry between two union leaders," rather than a matter of public concern, but also concluded that the plaintiff's criticism of the commissioner's decision to discontinue police units and his call for a no-confidence vote *did* involve matters of public concern, given that "such speech . . . plainly constituted speech on a matter 'of political, social, or other concern' to the [relevant] community."  *Id.* at 400–01 (emphasis added) (quoting *Connick*, 461 U.S. at 146).  The speech alleged in this case, by contrast, is categorically different from that alleged in *Montero*, because it *exclusively* concerned Plaintiff's *personal* sick and vacation time.  (*See* Oct. 29, 2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance.)[14]  In other words, Plaintiff's

___

[14] Plaintiff also seeks to convert his purely personal grievances into matters of public concern by pointing to language in the July 27, 2020 Arbitration Opinion concerning his "industrial due process rights" and "limitations on management rights and discretion."  (Pl's Opp'n 18; *see also* July 27, 2020 Arbitration Op. at 14–18.)  However, nothing in that Arbitration Opinion changes the fact that Plaintiff's grievances sought to address purely personal

grievances, as alleged, "principally focus[] on [his] personal issues" and were "calculated to redress personal [complaints]" that, at best, only "touch[ed] on [] matter[s] of general importance." *Shara*, 46 F.4th at 85 (recognizing that such speech "does not involve a matter of public concern"); *see also Ruotolo*, 514 F.3d at 190 ("A public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.").

In sum, insofar as Plaintiff's First Amendment retaliation claims rely upon the grievances and demands for arbitration that he filed as a Union officer from 2019 to 2020, those claims are dismissed. *See Matthews*, 779 F.3d at 172 (noting that, if "the subject of the employee's speech was [not] a matter of public concern . . . that is the end of the matter" (quotation marks and citation omitted)). Thus, the sole remaining allegation of protected activity in the Complaint concerns Plaintiff's support of an opposing candidate for sheriff in 2015. (*See* Compl. ¶ 7.) *See also Lynch*, 811 F.3d at 580 (recognizing that employees have a "First Amendment interest in expressing support for a candidate for election to public office" and stating that "[e]ndorsements of candidates for political office are at the core of First Amendment protected speech").

---

issues. *See Montero*, 890 F.3d at 399–400 ("[S]peech that principally focuses on an issue that is personal in nature and generally related to *the speaker's own situation* or that is *calculated to redress personal grievances*—even if touching on a matter of general importance—*does not qualify* for First Amendment protection." (emphasis added) (alterations adopted) (citations and quotation marks omitted)).

       Relatedly, Plaintiff asserts that "collective bargaining positions necessarily have powerful political and civic consequences." (Pl's Opp'n 17 (quoting *Rowland*, 718 F.3d at 134).) The Court does not doubt that proposition, but Plaintiff ignores the reality that he has not alleged he was retaliated against for any position he took on a collective bargaining issue, and the grievances that he actually filed do not reflect advocacy for any particular collective bargaining position, but rather they seek to vindicate Plaintiff's *personal* concerns under a pre-existing CBA that related to his own sick and vacation time. (*See generally* Compl.; Oct. 29, 2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance.)

<u>b.  Speaking as a Private Citizen</u>

The Court next addresses—in the alternative—whether Plaintiff plausibly alleged that he spoke as a citizen, rather than pursuant to his official duties.  "If a public employee speaks not as a citizen but instead pursuant to his or her official duties, an employer's response to that speech does not violate the First Amendment."  *Huth v. Haslun*, 598 F.3d 70, 73–74 (2d Cir. 2010) (quotation marks omitted).  The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue [(i.e., a form or channel of discourse available to non-employee citizens)] exist[s]."  *Montero*, 890 F.3d at 397 (citation, some alterations, and quotations marks omitted); *see also Shara*, 46 F.4th at 83 (same). Although the second issue "may be of some help in determining whether one spoke as a citizen," it is not dispositive—the first inquiry is the critical one.  *Montero*, 890 F.3d at 397–98. "[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010).  "[W]here no clear official duty to speak is present on the record, [courts in] this Circuit focus[] on the subject, manner, and context of the speech to determine whether it relates to topics that are indispensable prerequisites to effective performance of the speaker's primary employment responsibility, and thus not entitled to First Amendment protection."  *Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 208–09 (E.D.N.Y. 2013) (quoting *Griffin v. City of New York*, 880 F. Supp. 2d 384, 396 (E.D.N.Y.2012)); *see also Shara*, 46 F.4th at 83 ("To determine whether a public employee speaks pursuant to his official duties, courts 'examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the

relationship between the two,' along with other contextual factors such as whether the plaintiff's speech 'was also conveyed to the public.'" (quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012))). "Ultimately, the question . . . is whether the employee's speech was part-and-parcel of [that person's] concerns about his ability to properly execute his duties." *Montero*, 890 F.3d at 398 (citation and quotation marks omitted); *see also Lane*, 573 U.S. at 240 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). Notably, the inquiry into whether a public employee spoke pursuant to his or her official duties is "a practical one." *Weintraub*, 593 F.3d at 202 (citation omitted).

To the extent that Plaintiff relies on his grievances in support of his First Amendment retaliation claims, the Court concludes that he was not speaking as a citizen in connection with those grievances.[15] As the Court has already explained, Plaintiff's grievances and requested remedies all related to his own, personal use of his sick and vacation time, including his ability to switch shifts to work on a day on which he had previously been approved for sick time in relation to a different shift. *See supra* Sections I.B.2, II.B.3.a. "An employee's hours . . . are [] within the ordinary bounds of [his or] her employment and are topics that are indispensable prerequisites to effective performance of plaintiff's primary employment responsibility[.]" *Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., USFD*, No. 14-CV-9696, 2017 WL 4221455, at *17 (S.D.N.Y. Sept. 20, 2017) (quotation marks omitted); *cf. Adams*, 705 F. Supp. 2d at 302–03 (concluding that the plaintiffs failed to plead that they spoke as citizens where they "base[d] their pleadings [on incidents that] concerned personal grievances . . . [such as their]

---

[15] Again, in response to Defendants' Motion, Plaintiff does not argue that he filed any grievances beyond the three identified by Defendants.

work schedules"). Indeed, it is difficult to imagine anything more "part-and-parcel" of an employee's "concerns about his ability to properly execute his duties" than one's interest in managing their schedule so that they can actually show up for work. *Montero*, 890 F.3d at 398 (citation and quotation marks omitted). Put another way, Plaintiff's grievances involved speech that "constituted an 'indispensable prerequisite" to the successful completion of his role as a [corrections officer,]" which, of course, depends upon his attendance at work. *Shara*, 46 F.4th at 83 (quoting *Weintraub*, 593 F.3d at 203).

Although it is not dispositive, the Court also notes that Plaintiff has failed to plead facts suggesting that there is any civilian analogue to the Union Grievance Forms he filed. *See Weintraub*, 593 F.3d at 203–04 (explaining that submitting letters to a local newspaper or discussing politics with a coworker are forms of speech with civilian analogues, while an internal communication pursuant to an employer's dispute-resolution policy is not); *see also Shara*, 46 F.4th at 86 (noting that "[t]he fact that there [was] no civilian analogue to [the plaintiff's] speech, since it occurred only in discussions with School District officials in the workplace and possibly in the process of union negotiations, reinforce[d]" the court's conclusion that he spoke only as an "employee," rather than a citizen).

The Court is unpersuaded by Plaintiff's arguments to the contrary. Again, Plaintiff relies heavily upon the Second Circuit's decision in *Montero*. (*See* Pl's Opp'n 15–17.) In particular, he asserts that "[t]he filing of grievances was not part of [P]laintiff's job responsibilities, [which is] the critical inquiry post-*Montero* for distinguishing speech engaged in as an employee as opposed to as a citizen[.]" (*Id.* at 16.) However, that assertion, at best, overstates the law. Although the extent to which a public employee's speech falls outside of his or her official responsibilities is relevant to the question of whether a public employee spoke as a citizen, *see*

*Shara*, 46 F.4th at 83, the Second Circuit has long made clear that speech "can be pursuant to" a public employee's "official job duties even though it is not required by, or included in, [his] job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203 (internal quotation marks omitted). Further, the relevant inquiry is not whether filing grievances was within Plaintiff's job responsibilities, but rather whether the *content* of that speech was "part-and-parcel of [his] about his ability to properly execute his duties." *Shara*, 46 F.4th at 83 ("To determine whether a public employee speaks pursuant to his official duties, courts examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two, along with other [relevant] contextual factors . . . ." (quotation marks omitted)).[16]

Thus, the Court concludes that Plaintiff was speaking as an employee—not a citizen—in connection with his grievances, which provides an alternative basis for rejecting his First Amendment retaliation claims to the extent that those claims rely upon his grievances.[17] However, Defendants do not challenge the notion that Plaintiff's support of a candidate for

---

[16] The Court is also unconvinced by Plaintiff's continued—and tortured—attempt to cast the facts of this case as meaningfully similar to the facts in *Montero*. (*See* Pl's Opp'n 17.) In *Montero*, the Second Circuit determined that the plaintiff "spoke in his role as a union officer, and [that] his union speech was not composed of statements made as a means to fulfill or undertaken in the course of performing his responsibilities as a police officer" where he leveled criticisms against a union's president, as well as against a decision of the police commissioner, and where he called for a no-confidence vote relating to that commissioner. 890 F.3d at 391, 399. By contrast, in this case Plaintiff has alleged no more than that he has filed three grievances that undisputedly focus on his personal sick and vacation time. (*See* Oct. 29, 2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance.)

[17] Given that Defendants did not raise it in their briefing, the Court declines to address the *Pickering* balancing analysis, which concerns whether "the relevant government entity had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Matthews*, 779 F.3d at 172 (quotation marks omitted).

30

sheriff who opposed Falco in 2015 constituted citizen speech. Accordingly, that aspect of

Plaintiff's claims remains alive at this stage of the analysis.

c. Adverse Employment Action

Beyond the requirements discussed above, "[t]o succeed on a First Amendment

retaliation claim, a plaintiff must show not only that the speech at issue was constitutionally

protected, but that as a result of this speech, he or she suffered an adverse employment action

caused by the defendant." *Montero*, 890 F.3d at 401. "An adverse action means any action by a

defendant that would deter a person of ordinary firmness from exercising his or her First

Amendment rights." *Loc. 3599, N.Y.C. Dep't of Env't Prot. Tech. Pro. Emps. v. City of New

York*, No. 23-CV-1035, 2024 WL 966077, at *10 (S.D.N.Y. Mar. 6, 2024) (quotation marks

omitted); *accord Heim*, 81 F.4th at 221 n.9; *Connelly v. County of Rockland*, 61 F.4th 322, 325

(2d Cir. 2023). Among other things, "[a]n adverse employment action may include discharging,

refusing to hire, refusing to promote, demoting, reducing the pay, or reprimanding an employee."

*Montero*, 890 F.3d at 401; *see also Wrobel*, 692 F.3d at 31 (listing "lesser sanctions, such as

failure to process a [] insurance form, demotion, . . . and press accusations of lying"). Asserted

adverse actions must be "more than de minimis." *Zelnik*, 464 F.3d at 226 (noting that "it would

trivialize the First Amendment to hold that harassment for exercising the right of free speech was

always actionable no matter how unlikely to deter a person of ordinary firmness from that

exercise" (alteration adopted) (citation omitted)).

Defendants argue that Defendants' alleged decision to deny Plaintiff a retirement badge

does not amount to an adverse action for purposes of his First Amendment retaliation claims.

(*See* Defs' Mem. 31–32.) In light of the sparse allegations in the Complaint, the Court agrees.

31

With respect to the retirement badge, the Complaint alleges that "in further retaliation for his union activities, [] Falco denied [Plaintiff] a retirement badge though [P]laintiff had been terminated in good standing because he could not return to work due to injuries he sustained in a work-related assault . . . and had an exemplary record of service."  (Compl. ¶ 25.)  Plaintiff further avers that "Falco never treated an officer who supported him and was separated from the department due to medical injuries in this manner[,] and no departmental policy or practice prevented him from issuing a retirement badge to [P]laintiff."  (*Id.* ¶ 26; *see also id.* ¶ 31 (claiming—as a cause of action—that the denial of a retirement badge was an adverse action on the part of Defendants in retaliation against Plaintiff based on "the exercise of his First Amendment associational and speech rights").)  However, nowhere in the Complaint does Plaintiff explain what a retirement badge is, why he wanted such a badge, or, indeed, why he was entitled to one.  (*See generally* Compl.)  Thus, the only inference the Court can draw here is that Plaintiff wanted a retirement badge (and for unknown reasons at that).  On this record, therefore, the Court simply cannot determine whether the denial of a retirement badge plausibly "would deter a person of ordinary firmness from exercising his or her First Amendment rights[,]"  *Loc. 3599*, 2024 WL 966077, at *10, or, alternatively, whether it was merely a "de minimis" act, *Zelnik*, 464 F.3d at 226.[18]

---

[18] Apart from the retirement badge, Defendants do not argue that the other alleged adverse actions—that Defendants wrongfully placed Plaintiff on AWOL status and suspended his pay and health insurance contributions, (*see* Compl. ¶ 30)—fail to meet the applicable standard.  That decision makes good sense, given that actions such as a "reduction in pay" and the "failure to process a[n] . . . insurance form" have been found to constitute cognizable adverse actions. *See Wrobel*, 692 F.3d at 31.  Also of note, Plaintiff himself concedes that his termination was not retaliatory but rather was based on the fact that "he could not return to work due to the injuries he sustained in a work-related assault" pursuant to § 71.  (Compl. ¶ 25; *see also id.* ¶ 31 (claiming that Plaintiff was "terminated for his incapacity to return to work following a workplace assault").)

Accordingly, Plaintiff's First Amendment retaliation claim as set forth in ¶ 31 of the Complaint—which relies exclusively upon the alleged denial of a retirement badge as an adverse action—is dismissed.

### d.  Causation

The final element that a plaintiff must plead to state a First Amendment retaliation claim is that "a causal connection exists between the protected speech and adverse employment action." *Foy*, 2024 WL 3270711, at *8.  As noted above, "[t]o permit an inference of causation, a plaintiff must show that the protected [First Amendment] activity was a substantial motivating factor in the adverse employment action." *Specht*, 15 F.4th at 605.  "A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time." *Id.* (noting that the Second Circuit had "previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation"); *see also Loc. 3599*, 2024 WL 966077, at *11 ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (citation omitted)).  In addition, plaintiffs can raise an inference of causation by pointing to "similarly situated co-employees were treated differently." *Loc. 3599*, 2024 WL 966077, at *11 ("The comparators must be similarly situated to the plaintiff in all material respects, which means that there must be a reasonably close resemblance of the facts and circumstances of the adverse actions across the plaintiff's and comparators' cases.").  "[A] plaintiff[, however,] may not rely on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary." *Cobb*, 363 F.3d at 108 (citations and quotation marks

omitted); *see also Belyea*, 2022 WL 3586559, at \*26 (same); *Raymond v. City of New York*, 317 F. Supp. 3d 746, 774 (S.D.N.Y. 2018) (same).

Here again, Plaintiff's Complaint falters.  Starting with his support of a candidate for sheriff who opposed Falco, Plaintiff alleges that the relevant campaign took place in 2015.  (*See* Compl. ¶ 7.)  That means that the remaining alleged adverse actions in this case—the decisions to place Plaintiff on AWOL status and suspend his pay and health insurance contributions, (*see id.* ¶ 30)—took place at least *seven years* after Plaintiff supported a candidate who opposed Falco, (*see id.* ¶¶ 17–19).  The Court has little trouble concluding, therefore, that Plaintiff cannot rely on his 2015 support of a different candidate for sheriff to sustain his remaining First Amendment retaliation claim.  *See Raymond*, 317 F. Supp. 3d at 774 ("There is no hard and fast rule for the amount of time that must pass before a causal connection is necessarily broken, but two years is far longer than the periods held relevant in many cases, and indeed, it is the rare case that finds a plausible claim when nearly a year rather than months have gone by." (alterations adopted) (quotation marks omitted)); *see also Specht*, 15 F.4th at 605 (noting that "the passage of *up to six months* between an adverse action and protected activity [may be] sufficient to permit an inference of causation" (emphasis added)); *Payson*, 2017 WL 4221455, at \*13 ("[W]hen a party relies on the mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action, . . . courts uniformly hold that the temporal proximity must be *very close*." (emphasis added) (quotation marks omitted)).  And insofar as Plaintiff asserts that Defendants retaliated against him for his general union association from 2019 to 2020—which took place at least two years before he was declared AWOL—that

assertion fails on causation grounds for the same reason, i.e., that that association is too attenuated in time to plausibly state a causal connection.[19]

The associational aspect of Plaintiff's claims falls short on the causation prong of the First Amendment retaliation analysis for a separate reason as well.  In *Lynch*, the Second Circuit determined that the plaintiff's "claim based on his association with the [u]nion" failed because "he ha[d] made no showing that [the defendant] retaliated against him because of his union membership, particularly as he ha[d] presented no evidence that she retaliated against any other police officer for membership or for holding office in the [u]nion." 811 F.3d at 583.  Although Plaintiff seeks to distinguish the facts here from those in *Lynch*, (Pl's Opp'n 21 n.5), in doing so, he merely relies on his conclusory allegation that Falco's "anti-union animus" had "manifested in his treatment of at least seven other union leaders who opposed his policies[,]" (Compl. ¶ 28). It bears repeating that Plaintiff cannot "rely on conclusory assertions of retaliatory motive to satisfy the [required] causal link."  *Cobb*, 363 F.3d at 108 (citations and quotation marks omitted).  Moreover, the Complaint is devoid of *any* specifics regarding the approximately seven

---

[19] The Court rejects Plaintiff's argument that his "return to work was the first realistic opportunity for Falco to retaliate in the way that he did[,]" that is, by declaring Plaintiff AWOL. (Pl's Opp'n 23–24.)  In light of the allegations in the Complaint, this argument simply does not hold water.  Plaintiff is alleged to have been out of work on § 207-c benefits starting in "early 2021." (*See* Compl. ¶¶ 12–13.)  At some unknown time before the summer of 2022, Falco is alleged to have ordered Plaintiff back to work and revoked his § 207-c benefits. (*See id.* ¶¶ 15–16.)  Based on the Complaint—which controls the Court's analysis at this stage of the case—it is not entirely clear to the Court that Falco was unable to declare Plaintiff AWOL before early 2023.

Moreover, this argument is further belied by the principal case Plaintiff relies upon.  In *Espinal v. Goord*, the Second Circuit reversed the district court's dismissal of the plaintiff's First Amendment retaliation claim.  *See* 558 F.3d 119, 130 (2d Cir. 2009).  In doing so, the Court stated that "[i]t is plausible that the [defendant-]officers waited to exact their retaliation at an opportune time . . . in order to have a ready explanation for any injuries suffered by [the plaintiff]." *Id.* at 129.  Here, however, Falco is alleged to have known about Plaintiff's union activities going back to approximately 2015. (*See generally* Compl.)  It strains credulity to plausibly suggest that Falco waited all those years to retaliate against Plaintiff.

purported comparators—that is, the Court cannot discern whether these comparators were "similarly situated to [ P]laintiff in all material respects," such that there was a "reasonably close resemblance of the facts and circumstances of the adverse actions across [ P]laintiff's and [the] comparators' cases." *Loc. 3599*, 2024 WL 966077, at *11. Indeed, the Complaint alleges *nothing* about these seven individuals, including—significantly—how Falco "treat[ed] them." (*See* Compl. ¶ 28.)[20]

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion. Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal of those claims is without prejudice.[21] If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise addressing the various deficiencies identified above, Plaintiff must do so within thirty days of the date of this Opinion & Order. There will be no extensions. Plaintiff is further advised that any amended complaint will completely replace, not supplement, the now-dismissed

---

[20] Plaintiff also alleges that "Defendants never put another officer who was eligible for workers compensation benefits if not 207-c [sic] on AWOL status, disallowing their use of earned accruals[,]" (Compl. ¶ 22); "Defendants have never treated another [c]orrections [o]fficer like this, that is, disallowing him or her to return to work after suspending their 207[-c] status and declaring them AWOL, as opposed to allowing them to receive worker compensation if unable to return to work while exhausting their accruals[,]" (*id.* ¶ 24); and "Falco never treated an officer who supported him and was separated from the department due to medical injuries in this manner . . . [,]" (*id.* ¶ 26). To the extent Plaintiff makes these allegations in an attempt to establish causation, his efforts are unavailing because he does not plausibly allege that any particular corrections officer had experienced a situation that bore a "reasonably close resemblance" to his own. (*See generally id.*) *See also Loc. 3599*, 2024 WL 966077, at *11 (noting that alleged "comparators must be similarly situated to the plaintiff in all material respects, which means that there must be a reasonably close resemblance of the facts and circumstances of the adverse actions across the plaintiff's and comparators' cases").

[21] Notwithstanding Defendants' argument to the contrary, (*see* Defs' Mem. 9, 15, 32 (arguing that the Court should dismiss Plaintiff's claims with prejudice); Defs' Reply 5, 10–14 (same)), the Court is not convinced that "the flaws in [the Complaint] are incurable[,]" *Kling v. World Health Org.*, 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) (quoting *Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009)).

Complaint.  Any amended complaint must therefore contain *all* of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.  If Plaintiff fails to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 15.)

SO ORDERED.

Dated:    September 19, 2024
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge

37