UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM LOPEZ,

                          Plaintiff,

        v.

SHERIFF LOUIS FALCO *and* COUNTY OF
ROCKLAND,

                          Defendants.

---

No. 23-CV-10420 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Robert B. Weissman, Esq.
Saretsky Katz Dranoff Weissman & Maynard, LLP
Elmsford, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff William Lopez ("Plaintiff") brings this Action against Sheriff Louis Falco

("Falco") and the County of Rockland (the "County," and together with Falco, "Defendants")

pursuant to 42 U.S.C. § 1983, alleging that Defendants retaliated against him in violation of his

rights under the First Amendment when, among other things, they declared him absent-without-

leave from his job and suspended him without pay.  (*See* Amend. Compl. ¶¶ 57–58 (Dkt. No.

23).)[1]  Before the Court is Defendants' Motion to Dismiss the Amended Complaint pursuant to

---

[1] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in
the upper-right corner of each page in cites from the record.

Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (*See* Not. of Mot. (Dkt. No. 32).)  For

the reasons that follow, the Court grants Defendants' Motion.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court must decide what documents it may consider in deciding

the instant Motion.  Defendants argue that the Court may take into consideration several

documents that Plaintiff referenced or otherwise relied upon in filing his Amended Complaint.

(Defs' Mem. of Law in Supp. of Mot. to Dismiss ("Defs' Mem.") 9–10 & 9 n.4 (Dkt. No. 33);

*see also* Decl. of Matthew R. Hughes, Esq. ("Hughes Decl.") (Dkt. No. 34).)  The Court notes

that Plaintiff does not object to its consideration of these materials.  (*See generally* Mem. of Law

in Opp'n to Mot. to Dismiss ("Pl's Opp'n") (Dkt. No. 35).)

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert

the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56."  *Markatos v.

Citibank, N.A.*, 760 F. Supp. 3d 70, 74 (S.D.N.Y. 2024) (quoting *Thomas v. Westchester Cnty.

Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002)); *accord Doe v. County of

Rockland*, No. 21-CV-6751, 2023 WL 6199735, at *1 (S.D.N.Y. Sept. 22, 2023).  "Nevertheless,

the Court's consideration of documents attached to, or incorporated by reference in the

Complaint, and matters of which judicial notice may be taken, would not convert the motion to

dismiss into one for summary judgment."  *Thomas*, 232 F. Supp. 2d at 275; *see also Bellin v.

Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions

to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into

the complaint by reference, and matters of which a court may take judicial notice" (quotation

marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a

Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration adopted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

Defendants have submitted the following documents in support of their Motion: (1) a Rockland County Correction Officers Benevolent Association Grievance Form dated October 29, 2019, (*see* Hughes Decl. Ex. B ("Oct. 29, 2019 Grievance") (Dkt. No. 34-2)); (2) a Rockland County Correction Officers Benevolent Association Grievance Form dated March 2, 2020, (*see id.* Ex. C ("Mar. 2, 2020 Grievance") (Dkt. No. 34-3)); (3) a Rockland County Correction Officers Benevolent Association Grievance Form dated October 5, 2020, (*see id.* Ex. D ("Oct. 5, 2020 Grievance") (Dkt. No. 34-4)); (4) an Arbitration Opinion and Award dated July 27, 2020, (*see id.* Ex. E ("July 27, 2020 Arbitration Op.") (Dkt. No. 34-5)); (5) seven Rockland County Correction Officers Benevolent Association Grievance Forms dated between January 2, 2019, and December 21, 2020 (*see id.* Ex. F ("Other 2019 and 2020 Grievances") (Dkt. No. 34-6)); (6) an Arbitration Opinion and Award dated November 24, 2022, (*see id.* Ex. G ("Nov. 24, 2022 Arbitration Op.") (Dkt. No. 34-7)); (7) an Authorization for Absence Form from STAT Health Medical Services, signed by James F. Gurniak, M.D. and dated December 7, 2022, (*see id.* Ex. H ("Dec. 7, 2022 Authorization for Absence Form") (Dkt. No. 34-8)); (8) a New York State and Local Retirement Notice of Doreen Cardillo's November 4, 2007 retirement, (*see id.* Ex. I ("Cardillo Retirement Notice") (Dkt. No. 34-9)); and (9) a Rockland County Office of the Sheriff Return to Work Notice directed to Officer Frank Olivier, dated Oct. 20, 2013, (*see id.* Ex. J ("Olivier Return to Work Notice") (Dkt. No. 34-10)).

The Court will consider the ten Grievance Forms and the Authorization for Absence form as these documents were referenced and relied upon by Plaintiff in his Amended Complaint, and because there is no dispute over their authenticity. *See Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *10 (S.D.N.Y. Sept. 30, 2015) ("[S]everal courts have considered grievances relevant to a plaintiff's claims where, as here, the plaintiff incorporated the grievances by reference into the complaint."); *see also Ellison v. Evans*, No. 13-CV-885, 2013 WL 5863545, at *1 n.5 (S.D.N.Y. Oct. 31, 2013) (considering grievances that the defendants submitted "[b]ecause the [] documents [were] either explicitly referred to or incorporated by reference in [the] plaintiffs' complaint"), *aff'd sub nom.*, *Fuller v. Evans*, 586 F. App'x 825 (2d Cir. 2014) (summary order); *Batista v. United States*, No. 23-CV-1545, 2025 WL 919439, at *3 (D. Conn. Mar. 26, 2025) (incorporating by reference medical records where the complaint reference plaintiff's diagnosis and procedures); *Picarella v. United States*, No. 22-CV-4983, 2024 WL 1435744, at *1 (E.D.N.Y. Apr. 3, 2024) (incorporating by reference "medical records underlying the claims made in the complaint"). The Court will also take judicial notice of the Arbitration Opinions and Awards as they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Cox v. Perfect Bldg. Maint. Corp.*, No. 16-CV-7474, 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017) ("[C]ourts have regularly taken judicial notice of arbitration awards . . . in considering a motion to dismiss."); *see also Dr.'s Assocs., Inc. v. Patel*, No. 18-CV-2386, 2019 WL 3916421, at *2 n.5 (S.D.N.Y. July 19, 2019) (same and collecting cases).

However, the Cardillo Retirement notice and the Olivier Return to Work Notice are not incorporated by reference into the Amended Complaint and Defendants offer no support for their claim that the Court can take judicial notice of them. (*See* Defs' Mem. 31 nn.7–8.) Thus, the

4

Court declines to consider those materials. *See NSI Int'l, Inc. v. Horizon Grp. USA, Inc.*, No. 20-CV-8389, 2022 WL 2110551, at *2 (S.D.N.Y. June 10, 2022) ("[Defendant] has not explained how the Court may take judicial notice of the exhibits and the Court therefore does not consider them."); *Hanner v. Westchester County*, No. 16-CV-7610, 2019 WL 1299462, at *4 (S.D.N.Y. Mar. 21, 2019) (same).

    B.  Factual Background

        Unless otherwise stated, the following facts are drawn from the Amended Complaint and the above-referenced exhibits submitted by Defendants.  The facts alleged in the Amended Complaint are assumed true for the purpose of resolving the instant Motion.  *See CompassCare v. Hochul*, 125 F. 4th 49, 56 (2d Cir. 2025).

        1.  Plaintiff's Union Activity

        Plaintiff is a former corrections officer who was employed by the County.  (AC ¶ 1.) During all times relevant to this Action, Falco served as the County's duly elected Sheriff.  (*Id.* ¶ 2.)

        Plaintiff served as an officer for the "Correction Officers' Association/Union" (the "Union") first in 2015–2017, and again as a secretary for the Union from 2019–2020.  (*Id.* ¶ 5.) During his 2019–2020 stint as an elected Union officer, in which Plaintiff worked closely with the president of the Union, David Bates ("Bates"), (*id.* ¶ 12), Plaintiff's "principal responsibility" was "[t]he review and filing of grievances," (*id.* ¶ 16).  Although, per the terms of the CBA, Union members could initiate grievances on their own, Plaintiff or Bates "drafted, reviewed, and signed off on nearly all grievances filed in 2019–20."  (*Id.* ¶ 10.)  Together with Bates, who "conferred with [P]laintiff" while reviewing grievances for filing, Plaintiff "initiated eleven grievances."  (*Id.* ¶¶ 11–12.)  The "majority of these grievances" were initiated "to vindicate the

terms of the [CBA] and assure its benefits to other members," and "did not concern the terms and conditions of [Plaintiff's] own employment."  (*Id.* ¶ 13.)

As alleged, Plaintiff, who was "highly knowledgeable about the Collective Bargaining Agreement [("CBA"),] and a principal source of guidance and advice to officers aggrieved by [] Falco and his immediate subordinates," was considered by Defendant to be one of the Union's "chief strategists and spokesman."  (*Id.* ¶¶ 6–7.)  Falco was "fully aware of [Plaintiff's] union activism, including his support in 2015 of Richard Vasquez," who had run against Falco.  (*Id.* ¶ 8.)  Additionally, in 2019, Bates directly informed Falco that "[P]laintiff had joined the [U]nion's Executive Board," (*id.* ¶ 9), and Falco knew both "[P]laintiff was deeply involved with the grievances filed by the [U]nion" and that "[U]nion leadership relied upon [Plaintiff] for his expertise in understanding and interpreting the [CBA]," (*id.* ¶ 14).  Falco allegedly "stated that the filing of these grievances infuriated him."  (*Id.* ¶ 15.)

The record currently reflects that 10 Union grievances were filed from 2019 to 2020, three of which were submitted directly by Plaintiff.  (*See* Oct. 29, 2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance; Other 2019 and 2020 Grievances.)  Plaintiff's three grievances related to various issues with his sick and vacation time.[2]  (*See generally* Oct. 29,

---

[2] Specifically, on October 29, 2019, Plaintiff submitted a Grievance Form stating that "[n]o where in [the] current agreement between the County . . . and the [Union] does it say an officer who calls in/has a pre-approved sick day (doctor appointment) can't work a switch on the following shift on that day," and seeking the return of "6 ½ hours of vacation time" and the removal of "[a] letter [reprimanding him] from his file."  (Oct. 29, 2019 Grievance 2.)  This grievance was ultimately brought before an arbitrator, who held in Plaintiff's favor and determined that Falco had violated the CBA.  (*See* July 27, 2020 Arbitration Opinion 19; *see* AC ¶¶ 17–19.)  Plaintiff alleges that "[t]his ruling set an important precedent for other union members[] who had been subjected to Falco's like failure to properly implement the CBA."  (AC ¶ 19.)

Next, in Plaintiff's March 2, 2020 Grievance Form, he alleged that he "ha[d] unlimited sick time due to his 911 illness, that has been certified by the [S]tate and [C]ounty," and asking

2019 Grievance; Mar. 2, 2020 Grievance; Oct. 5, 2020 Grievance.)  The other seven grievances complained of the removal of officers from "bid post[s]" on specific shifts, (*see* Other 2019 and 2020 Grievances 3, 6), certain officers being subjected to drug screening based on anonymous tips or random testing, (*see id.* at 12–17; 19–21; 23–24), a female officer being "directed to perform a pat-down search of a male inmate," (*see id.* at 26–27), and the imposition of a requirement that corrections officers wear body cameras, (*see id.* at 29–30).

In addition to his work reviewing and filing grievances, Plaintiff's Union activity included his "active[] participat[ion] on the Equalize Overtime Committee, the Contract Negotiations Committee, and the Grievance Committee, each of which met with [Falco] and/or his representatives."  (AC ¶ 21.)  During a November 2019 meeting of the Equalize Overtime Committee, Plaintiff was "particularly outspoken" when speaking to Falco about increasing the fairness of the overtime system.  (*Id.* ¶¶ 22–23.)  Falco "became upset with [P]laintiff, ended the meeting," and stated he would take the overtime matter to arbitration rather than continue to negotiate with the Union.  (*Id.* ¶ 24.)  In 2020, Plaintiff also participated in his leadership role in the "[U]nion's decision to oppose [Falco] over his implementation of a drug testing policy and his plans regarding deploying body worn cameras in the jail."  (*Id.* ¶ 25.)

---

"[n]ot to be penalized for having legitimate sick time use . . . [a]nd for his legitimate sickness not to result in the loss of employment benefits or to impair his employment rights under the law or CBA."  (Mar. 2, 2020 Grievance 2.)  This grievance was sustained by both reviewing supervisors.  (*Id.* at 3.)

Finally, in his October 5, 2020 Grievance Form, Plaintiff asserted that the County improperly required him to submit medical documentation for his use of family sick leave in September 2019, and that his 2019 employment evaluation noted his failure to provide that documentation.  (*See* Oct. 5, 2020 Grievance 2.)  In terms of the requested remedy, Plaintiff requested that Falco "[c]ease & [d]esist from requesting a doctor's note for family sick [leave] and to [c]ease from writing it on our evaluations."  (*Id.*)  Both of the reviewing supervisors rejected this grievance.  (*Id.* at 3.)

Plaintiff alleges that, as a result of Plaintiff's activities and actions relating to the Union, Falco "bore a grudge" against him, as well as other leaders of the Union "who he adversely and selectively treated." (*Id.* ¶ 26.)

### 2. Alleged Retaliation Against Plaintiff

On March 15, 2021, while working as a corrections officer, Plaintiff was assaulted and subsequently qualified for benefits under N.Y. Gen. Mun. Law § 207-c, which were awarded to him by the County. (*Id.* ¶¶ 27–28.)[3]  Throughout 2021, Plaintiff was "afflicted with work-related injuries," and his treating physicians did not clear him to return to work. (*Id.* ¶ 29.) However, on November 29, 2021, a doctor selected by Falco conducted an independent medical examination of Plaintiff. (*Id.* ¶ 30.)  On December 7, 2021, based upon that examination, Falco "ordered [P]laintiff to return to work and indicated his intent to remove [P]laintiff from [§] 207-c status."  (*Id.*)  The following day, Plaintiff requested arbitration to challenge Falco's return-to-work decision. (*Id.* ¶ 31.)  After a three-day hearing in the summer of 2022, the hearing officer issued a decision on November 24, 2022, finding that Falco "had a rational basis to require [P]laintiff to return to work the prior December." (*Id.* ¶ 32.)

Plaintiff did not appeal this decision but, instead, "sought to return to work." (*Id.* ¶¶ 33–34.)  However, Falco did not issue Plaintiff another return-to-work order, as Falco allegedly had "following similar outcomes" in two cases involving non-active Union members (Doreen Cardillo and Frank Olivier). (*Id.* ¶ 35.)  Instead, Defendants informed Plaintiff "[t]hrough counsel" that, before he could return to work, Plaintiff had to provide "a note from his own doctor clearing him to do so." (*Id.* ¶ 36.)  Plaintiff did so, reporting to work on December 7,

---

[3] As relevant here, § 207-c provides for the payment of salary and/or wages, as well as medical and/or hospital expenses, for corrections officers who are injured in connection with the performance of their duties. *See generally* N.Y. Gen. Mun. Law § 207-c.

2022, with a doctor's note stating he could "return to full duty." (*Id.* ¶ 37.) But once Defendants were "advised of this note"—and despite Falco "advocat[ing]" for Plaintiff's return during the 2022 hearing—they "refused to allow [P]laintiff to return to work" and instructed him "not to come back until he was contacted." (*Id.* ¶¶ 38–39.)

Falco then directed that Plaintiff "not be permitted to return to work" and placed him on absent-without-leave ("AWOL") status, suspended his salary, and refused to allow further contributions toward Plaintiff's family health insurance. (*Id.* ¶ 39.) As alleged, this AWOL declaration was contrary to the terms of the CBA, which required the County to credit Plaintiff's sick and vacation time against his basic work hours, and to continue to pay his salary and health insurance. (*Id.* ¶¶ 40–41.) Although Plaintiff objected to this treatment, nothing was done until around seven weeks later, in early 2023, when he "presented a note from a nurse practitioner who attested to his psychiatric unfitness." (*Id.* ¶ 45.)

Following the receipt of this note, Defendants put Plaintiff back on payroll and allowed him to use his vacation and sick time accruals. (*See id.* ¶ 46.) However, in May 2023, "more than [two] years after" Plaintiff sustained injuries from the assault that caused him to go out on § 207-c status, Defendants terminated Plaintiff's employment pursuant to N.Y. Civ. Serv. Law § 71. (*Id.*)[4] Plaintiff alleges that "Defendants never put another officer who was eligible for worker compensation benefits . . ., like Frank Olivier, on AWOL status, disallowing his use of earned accruals." (*Id.* ¶ 47.) Plaintiff further avers that "Defendants never treated another [c]orrections [o]fficer like this, that is, disallowing him/her to return to work after suspending their [§] 207[-c] status and declaring them AWOL, as opposed to allowing them to receive

---

[4] As relevant here, § 71 allows public employers to terminate the employment of civil servants with an occupational disability if they have been unable to perform their full duties for one year. *See generally* N.Y. Civ. Serv. Law § 71.

9

[w]orker [c]ompensation [benefits] if [they were] unable to return to work after exhausting their accruals."  (*Id.* ¶ 49.)

After Plaintiff's termination, "and in further retaliation for his union activities," Falco denied Plaintiff a retirement badge, even though Plaintiff had been terminated "in good standing" pursuant to § 71 because he could not return to work due to the work-related injuries he sustained in 2021.  (*Id.* ¶ 50.)  Retirement badges, which are "customarily issued to retiring officers," allow former officers "to maintain their personal weapons and to obtain professional courtesies."  (*Id.* ¶ 51.)  Plaintiff "wanted the retirement badge" both "as recognition of his services" and to obtain these courtesies, such as maintaining his three personal weapons.  (*Id.* ¶ 52.)  As alleged, Falco never denied a retirement badge to an officer "who was not active in the [U]nion like [P]laintiff and was separated from the department due to medical injuries," and "no departmental policy or practice prevented [Falco] from issuing a retirement badge to [P]laintiff." (*Id.* ¶ 53.)  Plaintiff avers that this treatment—which "caused [him] emotional distress and tangible detriment"—resulted from "anti-union animus." (*Id.* ¶¶ 54–55.)  Further, Plaintiff alleges that Falco's animus "manifested in his treatment of at least seven other [U]nion leaders who opposed his policies and who he caused to be terminated."  (*Id.* ¶ 55.)

C.  Procedural History

The Court discussed the procedural background of this Action in a previous Opinion granting Defendants' Motion to Dismiss the Complaint.  (*See* 2024 Opinion and Order Granting Defendants' Motion to Dismiss the Complaint ("2024 Opinion" or "2024 Op. & Order") 9–10 (Dkt. No. 22).)[5]  The Court therefore assumes familiarity with the dispute and describes subsequent proceedings only as relevant to deciding the instant Motion.

---

[5] The Court's 2024 Opinion and Order is published at *Lopez v. Falco*, No. 23-CV-10420, 2024 WL 4252561 (S.D.N.Y. Sept. 19, 2024).

On October 18, 2024, Plaintiff filed his Amended Complaint.  (*See* AC.)  On November 15, 2024, after requesting and receiving an extension of time to respond to the Amended Complaint, (*see* Dkt. Nos. 24–25), Defendants filed a pre-motion letter, requesting leave to file the instant Motion, (*see* Letter from Robert B. Weissman, Esq. to Court (Nov. 15, 2024) (Dkt. No. 26)).  Plaintiff filed a response on November 22, 2024.  (*See* Letter from Michael H. Sussman, Esq. to Court (Nov. 22, 2024) (Dkt. No. 27).)  Following a pre-motion conference on December 11, 2024, the Court adopted a briefing schedule for the instant Motion.  (*See* Dkt. (minute entry for Dec. 11, 2024); Scheduling Order (Dkt. No. 29).)

Pursuant to that schedule, Defendants filed their Motion on February 14, 2025.  (*See* Not. of Mot.; Hughes Decl.; Defs' Mem.)  On March 7, 2025, Plaintiff filed his Opposition.  (*See* Pl's Opp'n.)  Defendants filed their Reply on March 21, 2025.  (*See* Defs' Reply Mem. of Law in Supp. of Mot. to Dismiss ("Reply") (Dkt. No. 36).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id*. (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Analysis

In the Amended Complaint, Plaintiff raises a single claim: that Defendants "retaliated against him for the exercise of his First Amendment associational right, that is his right to be an active union member, as protected by the First Amendment."  (AC ¶ 57.)  In support of their Motion, Defendants argue that Plaintiff has merely "recharacterize[ed]" his prior asserted free speech claim as a free association claim, and that his grievances and union activity do not constitute either protected speech or association.  (*See* Defs' Mem. 13–15.)  Further, Defendants contend that Plaintiff's grievances—as well as the other grievances he helped file—do not constitute matters of public concern.  (*See id.* at 15–21.)  Next, Defendants argue that Plaintiff spoke as an employee, not a private citizen.  (*Id.* at 21–28.)  Finally, Defendants assert that the denial of his retirement badge is not a cognizable adverse action, (*id.* at 31–32), and moreover, Plaintiff fails to plead a causal relationship between his union activities and the alleged retaliation, (*id.* at 28–31).

The Court will address Defendants' arguments only as necessary to resolve the instant Motions.

1.  Plaintiff's Claim

As an initial matter, the Parties dispute what type of retaliation claim Plaintiff has pled and, accordingly, what standard should be applied.  Defendants argue that Plaintiff has simply recast his free speech claim as a free association claim and that, regardless of labels, it should be analyzed under the same framework this Court previously applied in its 2024 Opinion.  (*See* Defs' Mem. 13–14; *see also* 2024 Op. & Order 12–13.)  In contrast, Plaintiff argues that he has raised a retaliation claim based not on speech, but on free *association* as a union member, which he asserts is governed by the strict scrutiny standard laid out in *State Employment Bargaining Agency Coalition v. Rowland*, 718 F.3d 126 (2d Cir. 2013), and accordingly, does not require

Plaintiff to demonstrate that he acted as a private citizen speaking on a matter of public concern. (*See* Pl's Opp. 13–16.)  Plaintiff is incorrect.

The Second Circuit has held that the public concern requirement applies to claims for First Amendment association, as well as for speech, including where plaintiffs allege the retaliation is based upon union activity.  *See Cobb v. Pozzi*, 363 F.3d 89, 102 (holding "that a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern"); *see also Lynch v. Ackley*, 811 F.3d 569, 583 (2d Cir. 2016) (noting that a union employee's freedom of association claim "is subject to the same analysis as. . .[plaintiff's] First Amendment free-speech right"); *Singer v. Ferro*, 711 F.3d 334, 341 (2d Cir. 2013) ("[A] public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern." (citing *Cobb*, 363 F.3d at 102)); *Wrobel v. County of Erie*, 692 F.3d 22, 28 (2d Cir. 2012) ("Only if an employee's speech or associational conduct 'touches on a matter of public concern' can a First Amendment claim proceed." (citing *Cobb*, 363 F.3d at 102)).  Following this precedent, courts in the Second Circuit have repeatedly analyzed free association claims using the public concern rubric.  *See, e.g.*, *Massapequa Union Free Sch. Dist. v. N.Y.S. Bd. of Regents*, No. 23-CV-7052, 2025 WL 929710, at *24 (E.D.N.Y. Mar. 27, 2025) ("[T]he 'public concern' requirement applies to associational conduct in addition to speech."), *appeal withdrawn*, No. 25-1135, 2025 WL 2180773 (2d Cir. July 9, 2025); *Loc. 3599, NYC Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-CV-1035, 2024 WL 966077, at *9 (S.D.N.Y. Mar. 6, 2024) ("To establish that a public employee's . . . First Amendment associational conduct is protected from retaliation, it must first be shown that the employee spoke on a matter of public concern." (internal quotation marks omitted)); *Payson v.*

*Bd. of Educ. of Mount Pleasant Cottage Sch., USFD*, No. 14-CV-9696, 2017 WL 4221455, at *17 (S.D.N.Y. Sept. 20, 2017) ("[A] First Amendment freedom of association claim also requires that a public employee . . . persuade a court that the associational conduct at issue touches on a matter of public concern." (internal quotation marks omitted)); *Rivers v. N.Y.C. Hous. Auth.*, 176 F. Supp. 3d 229, 239 n.4, 243 n.9 (E.D.N.Y. 2016) ("[R]etaliation claims based on freedom of speech are subject to the same analysis as retaliation claims based on freedom of association," as "even associational claims must involve 'associational activity' touching upon a matter of public concern."), *aff'd sub nom. Crenshaw v. N.Y.C. Hous. Auth.*, 697 F. App'x 726 (2d Cir. 2017).

Plaintiff's argument that the Second Circuit "retreat[ed] from this position" in *Rowland* is unpersuasive. (*See* Pl's Opp. 15.) As this Court explained in its 2024 Opinion, in *Rowland*, defendants allegedly violated plaintiffs' free association right "by discriminatorily laying off *only* union members when reducing the state's work force." 718 F.3d at 129 (emphasis added). The Second Circuit held that "[c]onditioning public employment on union membership, no less than on political association, inhibits protected association and interferes with government employees' freedom to associate," and thus, must be subject to a strict scrutiny analysis. *Id.* at 133. In so holding, the Circuit differentiated between cases involving "an expression of views"—in which the public concern framework applies—and the instant facts, where "[p]laintiffs ha[d] not identified any expression of views by the laid-off workers, but instead allege[d] that [the] defendants retaliated against them because they refused [the] defendants' proposed concessions." *Id.* at 136 n.13. In other words, strict scrutiny was appropriate in *Rowland* because the employees were terminated *solely* because of their union membership.

Here, in stark contrast to the facts in *Rowland*, Defendants' alleged retaliation is not based solely on Plaintiff's union membership but instead, is inextricably intertwined with his "expression of views." (*See, e.g.*, AC ¶ 6 ("Defendant regarded [P]laintiff as one of the [Union's] chief strategists and spokesman."); *id.* ¶ 8 ("Falco was fully aware of [P]laintiff's union involvement, including his support in 2015 of Richard Vasquez for Sheriff against him."); *id.* ¶ 12 ("During his . . . stint in union leadership, in 2019–20, [P]laintiff . . . initiated eleven grievances.").) Accordingly, regardless of whether Plaintiff labels his claim as a free speech claim (as in his original Complaint) or as a free association claim (as here), he still "must persuade [the] court that the associational conduct at issue touches on a matter of public concern." *Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416, 2019 WL 3202747, at *17 (S.D.N.Y. July 16, 2019) (quoting *Cobb*, 363 F.3d at 102–03).[6]

2. Applicable Legal Standard

As the Court noted in its 2024 Opinion, "[f]or a public employee to state a First Amendment retaliation claim, the employee must allege that (1) he or she 'spoke as a citizen on a matter of public concern,' (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected speech and adverse employment action." *Foy v. N.Y. State Unified Ct. Sys.*, 740 F. Supp. 3d 136, 152 (E.D.N.Y. 2024) (ultimately quoting *Garcetti v.*

---

[6] Indeed, courts in this district have analyzed claims based on similar facts raising "hybrid" speech and associational claims, as this Court did in its 2024 Opinion and Order. (*See* 2024 Op. & Order 12.) *See Lynch*, 811 F.3d at 581–83 (assessing both free speech and free association claims based upon the same alleged retaliation for filing union grievances); *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 194 (2d Cir. 2003) (applying the *Pickering* analysis to a "hybrid speech/association[]" claim where the alleged retaliation was based on an "associational activity of which speech was an essential component"); *accord Agosto v. N.Y.C. Dep't of Educ.*, No. 17-CV-9066, 2019 WL 13255510, at *4–6 (S.D.N.Y. Aug. 12, 2019) (analyzing the plaintiff's separate "free-speech and association claims" together), *aff'd*, 982 F.3d 86 (2d Cir. 2020).

*Ceballos*, 547 U.S. 410, 418 (2006)); *accord Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018); *Novick v. Village of Wappingers Falls*, 376 F. Supp. 3d 318, 331 (S.D.N.Y. 2019).

"[T]he [preliminary] First Amendment inquiry must proceed in two parts. 'The first component requires determining whether the employee spoke as a citizen on a matter of public concern.'" *Montero*, 890 F.3d at 395 (alteration adopted) (quoting *Garcetti*, 547 U.S. at 418); *see also Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) ("A court conducts a two-step inquiry to determine whether a public employee's speech is protected: 'The first requires determining whether the employee spoke as a citizen on a matter of public concern.'" (quoting *Garcetti*, 547 U.S. at 418)). This first step itself involves "two inquiries": "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 420–22). Importantly, "a public employee bringing a First Amendment freedom of association claim must [likewise] persuade a court that the associational conduct at issue touches on a matter of public concern." *Ahmad*, 2019 WL 3202747, at *17 (quoting *Cobb*, 363 F.3d 89 at 102–03); *see also Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 246 (S.D.N.Y. 2009) (holding that "in order to state a viable First Amendment free association claim, Plaintiff must allege that the associational activity at issue touches upon a matter of public concern").

"If the answer is no [to either question in the first step of this analysis], the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Montero*, 890 F.3d at 395 (quoting *Garcetti*, 547 U.S. at 418).

> If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis[, so named in light of *Pickering v. Board of Education*, 391 U.S. 563 (1968)]: whether the relevant government entity "had an adequate justification for treating

the employee differently from any other member of the public based on the government's needs as an employer."

*Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 573 U.S. 228, 242 (2014)); *see also Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) ("[W]e ask first whether the employee's expressive conduct was speech as a citizen on a matter of public concern.  If the answer is yes, then the possibility of a First Amendment claim arises.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." (quotation marks omitted) (citing *Garcetti*, 547 U.S. at 418)).

The *Pickering* analysis requires the Court to "seek a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Connick v. Myers*, 461 U.S. 138, 142 (1983) (citation, alteration, and quotation marks omitted).  "In the *Pickering* balancing analysis, 'the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression.'"  *Jackler*, 658 F.3d at 237 (quoting *Connick*, 461 U.S. at 150).  "Justifications may include such considerations as maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute."  *Piscottano*, 511 F.3d at 271.  "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown."  *Jackler*, 658 F.3d at 237 (quoting *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999)).  "The weighing of the competing interests is a matter of law for the court."  *Id.*; *see also Jean-Gilles v. County of Rockland*, 463 F. Supp. 2d 437, 450 (S.D.N.Y. 2006) ("[T]his balancing of interests . . . poses a question of law for the court.").

"Evidence that such harms or disruptions have in fact occurred is not necessary.  The employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano*, 511 F.3d at 271.  "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52.  However, in order for Defendants to meet their burden justifying Plaintiff's discharge, there must be a "demonstrated nexus between the employee's speech and the employer's operations." *Piscottano*, 511 F.3d at 271.  "Where there is no such nexus, the state's interest as an employer is not implicated, and restrictions on the employee's speech will be subjected to the same scrutiny given to restrictions imposed on citizens' speech by the state as sovereign." *Id.* (citing *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 465–66, 467 n.11, 470 (1995)).

With respect to the second element of the First Amendment retaliation analysis, Plaintiff must demonstrate that Defendants took an adverse employment action against him that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Wrobel*, 692 F.3d at 31 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)); *accord Persaud v. City of New York*, No. 22-CV-2919, 2024 WL 2159852, at *4 (S.D.N.Y. May 14, 2024) (citing *Specht v. City of New York*, 15 F.4th 594, 604 (2d Cir. 2021)).  Finally, "[t]o demonstrate a causal connection a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quotation marks and citation omitted); *see also Heim*, 81 F.4th at 222 (same).

3. <u>Application</u>

a. <u>Protected Speech</u>

In its 2024 Opinion, the Court found that Plaintiff's support of a candidate for sheriff who opposed Falco in 2015 constituted protected citizen speech. (*See* 2024 Op. & Order 30–31.) Here again, Plaintiff asserts that his support of Falco's opponent was part of his union activity. (AC ¶ 8.) Accordingly, the Court again concludes that this speech or associational activity was protected under the First Amendment.[7] *See Lynch*, 811 F.3d at 580 (recognizing that employees have a "First Amendment interest in expressing support for a candidate for election to public office" and stating that "[e]ndorsements of candidates for political office are at the core of First Amendment protected speech").

However, as discussed below, the Court finds that the rest of Plaintiff's alleged speech and associational activities are not protected by the First Amendment.

i. <u>Matter of Public Concern</u>

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (citation and quotation marks omitted); *see also Jackler*, 658 F.3d at 236 ("[A] topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004))). "Whether speech is on a matter of public concern presents a question of law that takes into consideration

---

[7] Defendants do not contest that Plaintiff's support of Falco's opponent is protected speech. (*See generally* Defs' Mem.)

the content, form, and context of a given statement." *Specht*, 15 F.4th at 600; *accord Connick*, 461 U.S. at 147–48; *Montero*, 890 F.3d at 399. "[S]peech that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection." *Montero*, 890 F.3d at 399–400 (alterations adopted) (citations and quotation marks omitted). In this analysis, the "forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern," because a "petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011); *accord Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020).

In its 2024 Opinion, the Court concluded that Plaintiff's speech and associational conduct did not "pertain to a matter of public concern because they reflect speech on a purely private matter—namely an employee's dissatisfaction with personal sick and vacation time matters." (*See* 2024 Op. & Order 22 (citations omitted and alterations adopted).) Plaintiff now argues that the allegations in the Amended Complaint demonstrate that his claim "is based, not upon his own personal grievances, but rather on his association with the union and role therein as a leader and advocate on behalf of the other union members." (Pl's Opp. 19–20.) Specifically, he asserts that his "own associational activity in acting as a source of institutional knowledge and assisting others in seeking to enforce the terms of the CBA implicated public concern." (*Id.* at 20–21 (emphasis removed).) In other words, Plaintiff functionally argues that his membership in and advocacy for the Union is, itself, a matter of public concern. The Court is unpersuaded.

Some courts in this Circuit "have found that union membership is per se a matter of public concern." *Payson*, 2017 WL 4221455, at *16 (collecting cases); *see also Loc. 3599*, 2024 WL 966077, at *9 (same). The Second Circuit, however, has never so held. Rather, the Circuit has clarified that, "although it is true that union-related speech *can* address a matter of public concern, [it has] 'rejected the notion that all activities undertaken through a union *necessarily* become matters of public concern merely by virtue of their collateral connection to the union.'" *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 85 (2d Cir. 2022) (quoting *Agosto*, 982 F.3d at 97); *see also Lynch*, 811 F.3d at 582 (same). For instance, union activity that concerns "[l]abor versus management disputes . . . almost invariably involve[s] a conflict between the labor force and management over an issue that concerns the terms and conditions of employment," and "often ha[s] a strong flavor of 'personal grievance' notwithstanding that the personal grievance is shared by numerous employees." *Lynch*, 811 F.3d at 581; *see also Agosto*, 982 F.3d at 95 (noting that activity that "principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances"—such as "[f]iling a grievance raising [the speaker's] own alleged injuries"—does not implicate matters of public concern). However, union-related speech or conduct that "invokes basic aspects of the right to unionization," *Lynch*, 811 F.3d at 581, or touches on "matter[s] of political, social, or other concern to the community" can implicate matters of public concern, *Montero*, 890 F.3d at 399 (internal quotation marks omitted).

In keeping with this reasoning, the Second Circuit has found there was no public concern implicated where: a plaintiff filed a union grievance based on management's presence at a union meeting, *Lynch*, 811 F.3d at 582; a public school teacher filed multiple union grievances on behalf of himself and other members of a union based on his management's failure to comply

with the collective bargaining agreement, *Agosto*, 982 F. 3d at 96–97; and a school bus driver

and Vice President of the bus driver's union raised concerns to management, "purportedly on

behalf of union members, about matters including bus safety," *Shara*, 46 F.4th at 81, 87–88.  In

contrast, the Circuit has found that union speech *had* implicated matters of public concern where

a police officer and union leader spoke at union meetings and criticized certain departmental

policies as "endanger[ing] public safety."  *Montero*, 890 F.3d at 400–401.

Here, Plaintiff's alleged union activity does not implicate the basic right to unionization

or matters of political, social, or other concern to the community.  Rather, the grievances

Plaintiff filed himself or assisted others in filing all focus on labor and employment

disagreements—i.e., issues with terms of employment.  (*See* Oct. 29, 2019 Grievance, Mar. 2,

2020 Grievance, Oct. 5, 2020 Grievance (grievances filed by Plaintiff regarding his schedule,

vacation, and sick time); Other 2019 and 2020 Grievances (seven grievances regarding: removal

from bid posts, drug screening of corrections officers, a female officer being directed to perform

a pat-down search of a male inmate, and a body-cam requirement).)  Because these grievances

boil down to "labor versus management disputes," *Lynch*, 811 F.3d at 581, Plaintiff's role in

filing them is precisely the type of activity that concerns only employees, not the public at large,

*see Shara*, 46 F.4th at 87–88 ("Reporting policies, even when discussed in the context of union

negotiations, generally fall into the category of workplace and union operations, which [the

Second Circuit] ha[s] declined to treat as matters of public concern."); *see also Agosto*, 982 F.3d

at 96 (finding that plaintiff had "not identif[ied] how [a] dispute . . . about an internal [collective

bargaining agreement] procedure for altering teachers' planning periods is of political, social, or

other concern to the New York City community rather than an internal dispute of interest to

employees" (internal quotation marks and alterations adopted); *Stapleton v. N.Y.C. Dep't of*

*Educ.*, No. 22-CV-09351, 2024 WL 4451304, at *7 (S.D.N.Y. Apr. 18, 2024) (concluding that a school teacher and union leader's complaints "regarding the study abroad program and lack of parking at the school do not constitute matters of public concern as they pertain to issues that would be of concern only to employees and relate to the terms and conditions of employment"), *report and recommendation adopted,* No. 22-CV-9351, 2024 WL 4182602 (S.D.N.Y. Sept. 13, 2024); *Bagarozzi v. N.Y.C. Dep't of Educ.*, No. 18-CV-4893, 2019 WL 1454316, at *1 (S.D.N.Y. Mar. 31, 2019) (finding that grievances about staff parking privileges filed by a plaintiff acting "as a union representative on behalf of others" did not implicate matters of public concern); *Payson*, 2017 WL 4221455, at *19 (finding that a union representative's advocacy on behalf of other teachers did not implicate matters of public concern because the representative still "had a personal interest in the outcome of her actions," as they were "related to internal disputes about the terms and conditions of employment").

Similarly, as the Court previously noted, (*see* 2024 Op. & Order 24–25), Plaintiff's other union activity—i.e., his "participation in various committees and negotiations with the Sheriff over the CBA's terms," (Pl's Opp. 21)—was focused on classic labor versus management disputes, (*see* AC ¶ 21 ("Plaintiff . . . participated on the Equalize Overtime Committee, the Contract Negotiations Committee, and the Grievance Committee."); *id.* ¶ 22 ("Plaintiff s[ought] to increase the fairness of the overtime system . . . ."); *id.* ¶ 25 ("[P]laintiff participated in the [U]nion's decision to oppose [Falco] over his implementation of a drug testing policy and his plans regarding deploying body worn cameras in the jail.")).  This activity does not automatically become a matter of public concern merely by virtue of Plaintiff's membership in the union.  *See Montero*, 890 F.3d at 399 ("[The] broad dicta [in *Clue v. Johnson*, 179 F.3d 57 (2d Cir. 1999)] that union activities criticizing management constitute matters of public concern has been walked

back by our subsequent case law[, including *Lynch*.]"); *see also Cutaneo v. N.Y.C. Dep't of Educ.*, No. 23-CV-753, 2024 WL 3362215, at *7 (E.D.N.Y. Feb. 29, 2024) (rejecting plaintiff's argument that, "because [plaintiff] spoke as a union representative, and *not* as a teacher, [his] advocacy on behalf of the teachers' union [was] protected speech"); *Shara*, 46 F.4th at 86 ("[Plaintiff's] position as an officer of the union does not transform his employment-related conversations into speech as a citizen."); *Payson*, 2017 WL 4221455, at *19 ("[Plaintiff's] role as a Union representative does not entitle her to blanket First Amendment protection.").

Plaintiff's arguments to the contrary are unavailing.  First, that Plaintiff assisted other employees with grievances, rather than just file his own, does not transmute disputes over terms of employment into matters of public concern.  *See Agosta*, 982 F.3d at 97 (rejecting argument that plaintiffs "underlying acts of advocacy for other teachers during union meetings was protected," because plaintiff "d[id] not explain how his advocacy regarding other employees' internal employment disputes would transform those disputes into matters of public concern"); *see also Payson*, 2017 WL 4221455, at *18 ("The fact that others were involved in the snow day grievance makes it no less personal in nature."); *cf. Forman v. N.Y.C. Dep't of Educ.,* No. 19-CV-8156, 2022 WL 912130, at *9 n.10 (S.D.N.Y. Mar. 29, 2022) (reasoning without deciding that, because plaintiffs "often will not receive First Amendment protection" for filing internal grievances through a union, "[i]t follows that a public employee representing a teacher in an internal grievance also would be unlikely to receive First Amendment protection: if the employee's grievance does not touch on a matter of public concern, then why would representing that employee do so?").  Second, although Plaintiff now asserts that some of the grievances were "broader" and "generally involved matters of concern to the public,"—specifically, the grievances related to the drug testing and body camera policies, (*see* Pl's Opp. 21), he does not

allege so in the Amended Complaint.  Thus, this argument "fails for the simple reason that it was

not pleaded and a party cannot amend its complaint through a brief."  *Cortese v. Skanska Koch,*

*Inc.*, No. 20-CV-1632, 2021 WL 429971, at *10 n.4 (S.D.N.Y. Feb. 8, 2021); *see also Schulz v.*

*Medtronic, Inc.*, No. 21-CV-414, 2022 WL 503960, at *2 (D. Conn. Feb. 18, 2022) ("[I]t is

axiomatic that [a] [c]omplaint cannot be amended by the briefs in opposition to a motion to

dismiss."); *cf. Shara*, 46 F.4th at 87 (affirming the denial of a retaliation claim where,

"[a]lthough [plaintiff] now attempts to portray himself as a sort of whistleblower on bus safety,

the allegations in his [c]omplaint were much more pedestrian and involved little more than an

intramural dispute" (internal citation omitted)).[8]

Accordingly, Plaintiff has failed to allege that his involvement in the Union—i.e., his

negotiations, committee membership, and grievance assistance—implicated any matters of

public concern.[9]  Insofar as his retaliation claim is based upon that involvement, it is dismissed.

ii.  Speaking as a Private Citizen

Plaintiff fares no better on the next step of the analysis.  "If a public employee speaks not

as a citizen but instead pursuant to his or her official duties, an employer's response to that

speech does not violate the First Amendment."  *Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010)

(quotation marks omitted).  The Second Circuit has identified "two relevant inquiries to

determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside

of the employee's official responsibilities, and (2) whether a civilian analogue [(i.e., a form or

---

[8] Moreover, as Defendants point out, (*see* Reply 12–13), these grievances are all framed as reporting violations of the collective bargaining agreement—*not* as raising concerns about safety writ large, (*see* Other 2019 and 2020 Grievances 13–16, 23, 26, 29).

[9] Plaintiff cites *Scott v. Goodman*, 961 F. Supp. 424, 425 (E.D.N.Y. 1996), and *Murray v. Town of Stratford*, 996 F. Supp. 2d 90 (D. Conn. 2014), to argue that union membership in of itself satisfies the public concern requirement.  (Pl's Opp. 17–18.)  As these cases were both decided pre-*Lynch*, the Court is not persuaded by their analysis.

channel of discourse available to non-employee citizens)] exist[s]." *Montero*, 890 F.3d at 397

(citation and quotations marks omitted); *see also Shara*, 46 F.4th at 83 (same).  Although the

second issue "may be of some help in determining whether one spoke as a citizen," it is not

dispositive—the first inquiry is the critical one. *Montero*, 890 F.3d at 397–98.  "[S]peech can be

'pursuant to' a public employee's official job duties even though it is not required by, or

included in, the employee's job description, or in response to a request by the employer."

*Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010).  "[W]here no clear official duty to

speak is present on the record, [courts in] this Circuit focus[] on the subject, manner, and context

of the speech to determine whether it relates to topics that are indispensable prerequisites to

effective performance of the speaker's primary employment responsibility, and thus not entitled

to First Amendment protection." *Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d

196, 208–09 (E.D.N.Y. 2013) (quoting *Griffin v. City of New York*, 880 F. Supp. 2d 384, 396

(E.D.N.Y. 2012)); *see also Shara*, 46 F.4th at 83 ("To determine whether a public employee

speaks pursuant to his official duties, courts 'examine the nature of the plaintiff's job

responsibilities, the nature of the speech, and the relationship between the two,' along with other

contextual factors such as whether the plaintiff's speech 'was also conveyed to the public.'"

(quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012))).  "Ultimately, the question . . . is

whether the employee's speech was part-and-parcel of [that person's] concerns about his ability

to properly execute his duties." *Montero*, 890 F.3d at 398 (citation and quotation marks

omitted); *see also Lane*, 573 U.S. at 240 ("The critical question under *Garcetti* is whether the

speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely

concerns those duties.").  Notably, the inquiry into whether a public employee spoke pursuant to

his or her official duties is "a practical one." *Weintraub*, 593 F.3d at 202 (citation omitted).

The Court previously found that Plaintiff did not demonstrate that he spoke as a private citizen because his grievances "involved speech that 'constituted an indispensable prerequisite to the successful completion of his role as a [corrections officer.]'" (2024 Op. & Order 28–29 (quoting *Shara*, 46 F.4th at 83 (internal quotation marks omitted)).) Plaintiff now asserts that he spoke as a private citizen because his "job duties did not require him to serve as a union officer" and thus, his activity was "designed to ensure the effective functioning of a public sector union in protecting employee rights and ensing the effective and efficient operation of government." (Pl's Opp. 24.) Yet, just as "[a] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run," *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) (citation omitted), Plaintiff's "position as an officer of the union [cannot] transform his employment-related conversations into speech as a citizen," *Shara*, 46 F.4th at 86.

Plaintiff's arguments do not align with the actual speech and associational activity as alleged in the Amended Complaint. In contrast with Plaintiff's broad framing in his opposition to the Motion, the grievances that Plaintiff assisted in filing, as well as his own grievances, only concerned the basic functions of employment: pay, scheduling, working conditions, and internal operations. (*See* Oct. 29, 2019 Grievance 2 (Plaintiff's grievance asserting that nowhere in the CBA "does it say an officer who calls in/has a pre-approved sick day (doctor appointment) can't work a switch on the following shift on that day"); Mar. 2, 2020 Grievance 2 (Plaintiff's grievance alleging he "ha[d] unlimited sick time due to his 911 illness" and asking "[n]ot to be penalized for having legitimate sick time use"); Oct. 5, 2020 Grievance 2 (asserting Plaintiff was improperly required to submit medical documentation for his use of family sick leave); *see also* Other 2019 and 2020 Grievances 3, 6 (complaining of the removal of officers from "bid post[s]"

on specific shifts); *id.* at 12–17; 19–21; 23–24 (complaining of officers being subjected to drug screening); *id.* at 26–27 (a female officer complaining of being "directed to perform a pat-down search of a male inmate"); *id.* at 29–30 (grieving a requirement that corrections officers wear body cameras).)

Similarly, Plaintiff's other union involvement focused on equalizing overtime rates and opposing a body camera requirement—again, activities indisputably related to the terms and conditions of the corrections officers' employment.  (AC ¶¶ 21–25.)  Thus, because Plaintiff's speech and associational activity was based on "topics that are indispensable prerequisites to effective performance of [the plaintiff's] primary employment responsibility," *Payson*, 2017 WL 4221455, at *17, the Court concludes that he did not speak as a private citizen in connection with those activities, *see Shara*, 46 F.4th at 86 (concluding that plaintiff's discussions regarding school bus reporting protocols "were conducted pursuant to his official work duties and constituted an 'indispensable prerequisite' to the successful completion of his role as a bus driver" (quoting *Weintraub*, 593 F.3d at 203); *Payson*, 2017 WL 4221455, at *18 (finding that "although [plaintiff] was a representative of the Union," her grievances "were within the scope of her employment duties . . . because hours, compensation and the dynamic between employees and their supervisors are necessary to effectively perform one's job"); *Adams v. N.Y. State Educ. Dep't*, 705 F. Supp. 2d 298, 302–03 (S.D.N.Y. 2010) (finding plaintiffs did not speak as private citizens when they filed "personal grievances . . . generally relating to their official duties, work schedules, working conditions, or employer administrative policies and internal operations").[10]

---

[10] Plaintiff concedes that "there may not be a civilian analogue to the grievance procedure," but argues, without support, that "there is certainly a civilian analogue to assisting and advising someone in understanding their rights and engaging in concerted action to protect those rights."  (Pl's Opp. 25.)  Even if the Court accepts this broad reframing, "the existence of a

Accordingly, insofar as Plaintiff's retaliation claim is based upon his union activity and grievance advocacy, his speech and associational activity is unprotected.[11]  However, as noted above, he engaged in protected speech by supporting Falco's opponent and thus, the Court continues its analysis.

---

civilian analogue is not dispositive of whether a public employee spoke as a private citizen," *Montero*, 890 F.3d at 397, and here, is insufficient to support a finding that Plaintiff spoke in his private capacity.

[11] Plaintiff's attempt to analogize his case to *Montero* and *Matthews* is unsuccessful.  As the Court previously explained, the plaintiff in *Montero* made a union speech "level[ing] criticisms against a union's president, as well as against a decision of the police commissioner, and . . . call[ing] for a no-confidence vote relating to that commissioner."  (2024 Op. & Order 30 n.16 (citing *Montero*, 890 F.3d at 391, 399).)  The Second Circuit accordingly concluded that the plaintiff's "union speech was not composed of statements made as a means to fulfill or undertaken in the course of performing his responsibilities as a police officer."  (*Id.* (citing *Montero*, 890 F.3d at 391, 399).)  Similarly, in *Matthews*, the Circuit concluded the plaintiff spoke as a citizen when he criticized an arrest-quota policy to his commanders and "no role in setting policy" and was not "expected to speak on policy nor consulted on formulating policy." 779 F.3d at 174.  In contrast, here, Plaintiff alleges that he filed his own grievances related to his personal sick and vacation time, assisted union members with filing grievances concerning the terms of their employment, and participated in committees concerning the same.  *Montero* and *Matthews* are thus inapposite.

b.  Adverse Employment Action

Next, "[t]o succeed on a First Amendment retaliation claim, a plaintiff must show not

only that the speech at issue was constitutionally protected, but that as a result of this speech, he

or she suffered an adverse employment action caused by the defendant."  *Montero*, 890 F.3d at

401.  "An adverse action means any action by a defendant that would deter a person of ordinary

firmness from exercising his or her First Amendment rights."  *Loc. 3599*, 2024 WL 966077, at

*10 (quotation marks omitted); *accord Heim*, 81 F.4th at 221 n.9; *Connelly v. County of*

*Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).  Among other things, "[a]n adverse employment

action may include discharging, refusing to hire, refusing to promote, demoting, reducing the

pay, or reprimanding an employee."  *Montero*, 890 F.3d at 401; *see also Wrobel*, 692 F.3d at 31

(listing "lesser sanctions, such as failure to process a[n] [] insurance form, demotion, . . . and

express accusations of lying").  Asserted adverse actions must be "more than de minimis."

*Zelnik*, 464 F.3d at 226 (noting that "it would trivialize the First Amendment to hold that

harassment for exercising the right of free speech was always actionable no matter how unlikely

to deter a person of ordinary firmness from that exercise" (alteration adopted) (citation omitted)).

Plaintiff alleges that he suffered two adverse actions: (1) the denial of "1,000 hours of

accruals" and the suspension of his pay and health insurance; and (2) the denial of a retirement

badge.  (AC ¶¶ 57–58.)  In its prior Opinion, the Court found that suspension of Plaintiff's pay

and health insurance constituted an adverse action, and maintains that conclusion here.[12]  (*See*

2024 Op. & Order 32 n.18 ("[A]ctions such as a 'reduction in pay' and the 'failure to process

---

[12] Defendants do not suggest that the suspension of Plaintiff's pay and health insurance
does *not* qualify as an adverse employment action.  (*See generally* Defs' Mem.)

a[n] . . . insurance form' have been found to constitute cognizable adverse actions" (quoting *Wrobel*, 692 F.3d at 31)).)

However, while the Court previously found that Plaintiff had not provided sufficient allegations to demonstrate that the denial of a retirement badge constituted an adverse action, (*see* 2024 Op. & Order 32), Plaintiff now provides additional allegations supporting his assertion that the denial of a retirement badge "would deter a person of ordinary firmness from exercising his or her First Amendment rights," *Loc. 3599*, 2024 WL 966077, at *10. Specifically, he alleges that such badges allow former officers "to maintain their personal weapons and to obtain professional courtesies," and that he "wanted the retirement badge" both "as recognition of his services" and to obtain these courtesies, such as maintaining his three personal weapons. (AC ¶¶ 51–52.)

Defendant argues that because Plaintiff did not retire but was instead terminated, "the denial of a benefit to which a person has no expectation" is not a sufficient adverse action. (Defs' Mem. 31–32.) However, drawing all reasonable inferences in favor of Plaintiff, the Court can infer that Plaintiff reasonably anticipated he would receive a retirement badge since his termination was due to medical reasons. (*See* AC ¶ 53 ("Falco never treated an officer who was not active in the [U]nion like [P]lainitff and was separated from the department due to medical injuries in this matter and no departmental policy or practice prevented him from issuing a retirement badge to [P]laintiff.").) Accordingly, the Court assumes here that the denial of these retirement benefits could deter a person of ordinary firmness from exercising their First Amendment rights. *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *14 (S.D.N.Y. Mar. 25, 2019) ("[D]ecreasing or delaying [retirement] benefits is an adverse employment action."); *Croswell v. Triborough Bridge & Tunnel Auth.*, No. 03-CV-2990, 2007

WL 2274252, at *12 (S.D.N.Y. Aug. 7, 2007) (same); *Gilford v. City of New York*, No. 03-CV-91, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004) ("[T]he denial of benefits to which an employee is otherwise entitled may constitute an 'adverse' employment action."), *aff'd*, 136 F. App'x 390 (2d Cir. 2005); *cf. Terry v. Ashcroft*, 336 F.3d 128, 142–43 (2d Cir. 2003) (holding, on an appeal of a district court's summary judgment, that "a reasonable fact-finder could conclude that the suspension of [the plaintiff's] firearms privileges constituted an adverse employment action").

c. <u>Causation</u>

Having found that at least some of Plaintiff's speech was protected by the First Amendment, namely, his support of Falco's opponent, and that Plaintiff suffered at least two adverse employment actions, the remaining question is whether Plaintiff has alleged sufficient facts to plausibly establish causation between the protected speech and the adverse employment actions. As it did in connection with the first Motion to Dismiss, the Court here concludes that Plaintiff has failed to demonstrate a causal connection between his protected conduct and the alleged adverse employment actions.

"To permit an inference of causation, a plaintiff must show that the protected [First Amendment] activity was a substantial motivating factor in the adverse employment action." *Specht*, 15 F.4th at 605. "A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time." *Id.* (noting that the Second Circuit had "previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation"); *see also Loc. 3599*, 2024 WL 966077, at *11 ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by

adverse treatment in employment, or directly by evidence of retaliatory animus." (citation

omitted)).  In addition, plaintiffs can raise an inference of causation by pointing to "similarly

situated co-employees were treated differently."  *Loc. 3599*, 2024 WL 966077, at *11 ("The

comparators must be similarly situated to the plaintiff in all material respects, which means that

there must be a reasonably close resemblance of the facts and circumstances of the adverse

actions across the plaintiff's and comparators' cases.").  "[A] plaintiff[, however,] may not rely

on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce

some tangible proof to demonstrate that his version of what occurred was not imaginary."  *Cobb*,

363 F.3d at 108 (citations and quotation marks omitted); *see also Belyea v. City of Glen Cove*,

No. 20-CV-5675, 2022 WL 3586559, at *26 (E.D.N.Y. Aug. 22, 2022) (same); *Raymond v. City

of New York*, 317 F. Supp. 3d 746, 774 (S.D.N.Y. 2018) (same).

        Plaintiff's only protected speech—i.e., his support of Falco's opponent—occurred in

2015, at least seven years before Defendants allegedly suspended his pay or denied him a

retirement badge in 2022.  (AC ¶ 8.)  Accordingly, Plaintiff cannot plead a causal connection to

support his retaliation claim.  *See Payson*, 2017 WL 4221455, at *13 ("[W]hen a party relies on

the mere temporal proximity between an employer's knowledge of protected activity and an

adverse employment action, . . . courts uniformly hold that the temporal proximity must be *very

close*." (emphasis added) (quotation marks omitted)); *Thomas v. N.Y.C. Dep't of Educ.*, No. 09-

CV-5167, 2019 WL 13180922, at *10 (E.D.N.Y. Feb. 22, 2019) (dismissing a First Amendment

claim where the "interval of more than three years" between the protected speech and the

retaliation was "far too long to support an inference of causation based on temporal proximity");

*Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 289 (E.D.N.Y. 2012), (noting the

"temporal proximity between [the plaintiff's] protected speech and the adverse employment

action [was] too remote and attenuated to establish a causal connection" when "[t]he protected speech occurred in 2001, and [the adverse action occurred] in February 2005"), *aff'd*, 519 F. App'x 724 (2d Cir. 2013).  Similarly, even if Plaintiff's other union activity was protected speech, the two-to-three-year interval between that activity and the adverse actions is similarly too attenuated to support an inference of causation.  *See Forman*, 2022 WL 912130, at *14 (dismissing First Amendment retaliation claim based on union activity where the "gap of four-and-a-half months between the protected speech and the alleged retaliation [was] too long to infer causation in these circumstances"); *see also Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (affirming the dismissal of a First Amendment retaliation claim when "more than a year passed between [the plaintiff's] accusations . . . and the initiation of disciplinary proceedings"). [13]

    Plaintiff's other allegations of Falco's purported animus are similarly insufficient to establish causation.  Plaintiff contends that Falco treated two other, non-union members, more favorably than Plaintiff by issuing them return-to-work orders, (AC ¶ 35), but does not provide *any* details demonstrating that they were similarly situated to Plaintiff or detail any specifics about their leave and subsequent return to work, (*see generally id.*).  Accordingly, the Court cannot identify whether these comparators were "similarly situated to [P]laintiff in all material respects," such that there was a "reasonably close resemblance of the facts and circumstances of

---

[13] Plaintiff argues that 2022 was "the first real instance where Falco was faced with an opportunity to implement a specific employment determination that could have adversely affected plaintiff."  (Pl's Opp. 27–28.)  In other words, Plaintiff asks the Court to infer that Falco harbored animus against Plaintiff for his union activity but waited either three or seven years to take any retaliatory action against him.  Indeed, Plaintiff's allegation that Falco at first lobbied for Plaintiff to return to work, and then only later placed him on AWOL status, cuts against this inference.  (*See* AC ¶¶ 38–39.)  As the Court concluded in its 2024 Opinion, "[i]t strains credulity to plausibly suggest that Falco waited all those years to retaliate against Plaintiff."  (*See* 2024 Op. & Order 35 n.19.)

the adverse actions across [ P]laintiff's and [the] comparators' cases." *Loc. 3599*, 2024 WL 966077, at *11.

Plaintiff also alleges that Falco was "infuriated" by the filing of Union grievances, "became upset with [P]laintiff" during one negotiation, and "bore a grudge against" him. (AC ¶¶ 15, 24, 26.) But Plaintiff "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link." *Cobb*, 363 F.3d at 108. Thus, these vague allegations of Falco's animus, "combined with the substantial gap of time between the protected speech and the alleged retaliation, do not allow for an inference of causation." *Forman*, 2022 WL 912130, at *15 (concluding, at summary judgment, that vague statements warning the plaintiff away from union activities were insufficient to demonstrate causation); *see Marraccini v. Belmont*, No. 19-CV-8458, 2020 WL 5505364, at *7 (S.D.N.Y. Sept. 10, 2020) (finding that "undeveloped allegations" that the defendant considered the plaintiff's support of another political candidate to be "a personal affront," for which the defendant "vowed revenge," "fail[ed] to support an inference of retaliatory intent with respect to conduct protected by the First Amendment").

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion.

Because this is the second adjudication of Plaintiff's claims on the merits, the Amended Complaint is dismissed with prejudice. *See Chavez v. Gutwein*, No. 20-CV-342, 2022 WL 1487781, at *7 (S.D.N.Y. May 11, 2022) (citing *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978)); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff[]has already had two bites at the apple, and they have proven fruitless" (alteration adopted and quotation marks omitted)).

The Clerk of Court is respectfully directed to terminate the pending Motion and close this

case.  (*See* Dkt. No. 32.)

SO ORDERED.

Dated:    September 17, 2025
          White Plains, New York

_____
                KENNETH M. KARAS
              United States District Judge